1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

| | |
|---|---|
| KA WAI JIMMY LO,<br><br>                        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>                        Defendant. | CASE NO. 2:17-cv-01202-TL<br><br>ORDER REGARDING THE PARTIES'<br>*DAUBERT* MOTIONS AND<br>MOTIONS *IN LIMIINE* |

11
12
13
14
15

16    This matter comes before the Court on the Parties' cross-motions to strike or exclude

17 certain expert testimony and motions *in limine*. Dkt. Nos. 65, 69, 99, 101. All four motions are

18 fully briefed. The Court has reviewed the relevant record and finds this matter suitable for

19 decision without oral argument. *See* Fed. R. Civ. P. 78(b).

20    For the reasons explained below, the Court hereby: (1) DENIES Plaintiff's motion to

21 exclude certain expert testimony (Dkt. No. 65); (2) GRANTS in part and DENIES in part the

22 Government's motion to strike and exclude certain expert opinions (Dkt. No. 69); (3) DENIES

23 Plaintiff's motions *in limine* (Dkt. No. 99); and (4) GRANTS in part and DENIES in part the

24 Government's motions *in limine* (Dkt. No. 101).

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 1

I.     BACKGROUND

This case arises out of a November 23, 2012, motor vehicle collision between Plaintiff Mr. Ka Wai Jimmy Lo and a U.S. Postal Service ("USPS") employee. Dkt. No. 1, at 2 (complaint). Following the denial of his administrative claim with the USPS under the Federal Tort Claims Act ("FTCA"), Plaintiff brought suit in this Court. *Id.* at 1.

Pursuant to the case scheduling order, the parties' expert witness disclosures and reports were due June 16, 2021. Dkt. No. 49 (scheduling order). Discovery in this case concluded as of August 16, 2021. *Id.* Dispositive motions as well as motions challenging expert witness testimony were due September 14, 2021. *Id.* Motions *in limine* were due December 13, 2021. Dkt. No. 90 (revised scheduling order). A bench trial is set for May 9, 2022. Dkt. No 126 (revised scheduling order).

Plaintiff filed a motion to exclude the expert testimony of Dr. Edward Dagher and Dr. Patrick Bays (Dkt. No. 65), and the Government filed separate motions to exclude the expert testimony of Ms. Cloie Johnson (Dkt. No. 69) and Dr. Sanford Wright (Dkt. No. 71). Both parties have also filed motions *in limine*. Dkt. Nos. 99, 101. The Court previously issued an order granting in part and denying in part the Government's motion to exclude Dr. Wright's testimony. Dkt. No. 91. The two remaining *Daubert* motions and the parties' motions *in limine* have been fully briefed and are now before the Court.

II.     LEGAL STANDARD

A.     ***Daubert* Motions**

Under Federal Rule of Evidence 702, "a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 2

facts or data; (c) the testimony is the product of reliable principles
and methods; and (d) the expert has reliably applied the principles
and methods to the facts of the case.

"Before admitting expert testimony into evidence, the district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under Rule 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 1188–89 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)). If an expert's opinion is found to be reliable, however, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 592, 596.

Notably, the purpose of a *Daubert* motion (challenging the admissibility of expert testimony) is to "protect *juries* from being swayed by dubious [expert] testimony"; and so, in the case of a bench trial, "there is less need . . . to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (internal quotation marks omitted) (emphasis in original) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)). Because a court may "make its reliability determination during, rather than in advance of, [a bench] trial[,] . . . the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702." *Id.* (internal quotation marks omitted) (quoting *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006)).

1    **B.    Motions *in limine***

2         "A motion in limine is a procedural mechanism to limit in advance [of trial] testimony or

3    evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009); *see*

4    *also* Fed. R. Evid. 401, 403. While the Federal Rules of Evidence do not explicitly permit

5    motions *in limine*, they are a part of a "district court's inherent authority to manage the course of

6    trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). A motion *in limine* should not be used

7    to resolve factual disputes, weigh evidence, or as a substitute for a motion for summary

8    judgment. *See, e.g.*, *Coppi v. City of Dana Point*, 2014 WL 12589639, at *3 (C.D. Cal. Feb. 24,

9    2014).

10        In the case of a bench trial, however, this threshold ruling is "generally superfluous."

11   *Heller*, 551 F.3d at 1112 (but such rulings may still be appropriate for "logistical and other

12   reasons"); *see also Coppi*, 2014 WL 12589639, at *3 ("[T]he first purpose of a motion in  limine,

13   protecting the jury, is inapplicable in the context of a bench trial."). A court may therefore decide

14   to defer its ruling on a motion *in limine* until trial, especially if the context of other evidence at

15   trial might prove to be helpful in the evaluation of admissibility. *See, e.g.*, *Wright v. Watkins &*

16   *Shepard Trucking, Inc.*, 2016 WL 10749220, at *3 (D. Nev. Jan. 19, 2016) ("The more prudent

17   course in a bench trial . . . is to resolve evidentiary doubts in favor of admissibility."); *see also*

18   *Parker v. BNSF Railway Co.*, 2021 WL 4819910, at *2 (W.D. Wash. Oct. 15, 2021) (deferring

19   rulings on some of the motions *in limine* until the bench trial).

20        Finally, a court's ruling on a pre-trial motion *in limine* is preliminary and can be revisited

21   at trial based on the facts and evidence as they are actually presented. *See, e.g., Luce*, 469 U.S. at

22   41 ("Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise

23   of sound judicial discretion, to alter a previous *in limine* ruling.").

24        Subject to these principles, the Court issues these rulings for the guidance of the parties.

1

### III.   DISCUSSION

2

**A.     Plaintiff's *Daubert* Motion**

3

    *1.      Dr. Dagher's opinions*

4

        Plaintiff seeks to exclude certain opinions from Dr. Dagher regarding Plaintiff's

5

surgeries, including the opinion that certain of Plaintiff's surgical procedures were not related to

6

the November 23, 2012 crash and that Plaintiff's lumbar surgery was not indicated at the time of

7

the surgery. Dkt. No. 65, at 2–3. Plaintiff bases his arguments on: (1) Dr. Dagher's

8

qualifications, arguing that Dr. Dagher is not a surgeon and lacks the specialized knowledge and

9

experience in surgical procedures, much less orthopedic surgery specifically; and (2) Dr.

10

Dagher's acknowledgement of subjectivity in deciding whether a surgery is necessary or

11

indicated. *Id.* at 4–5.

12

        The Government counters that "Dr. Dagher is not offering opinions about the surgeries

13

themselves," as in a medical malpractice lawsuit over a botched surgery, but rather on (1) the

14

medical necessity and causal relation between Plaintiff's 2016 lumbar surgery and the 2012

15

collision and (2) the causal relation between Plaintiff's 2020 hip surgery and the collision. Dkt.

16

No. 78, at 2. The Government argues that Dr. Dagher possesses the requisite expertise to offer

17

these opinions. *Id.* at 4–5. Dr. Dagher is a physiatrist who treats "a wide range of physical and

18

cognitive impairments and disabilities resulting from musculoskeletal conditions[] [and]

19

neurological conditions," among others, and who assesses whether surgery is medically

20

necessary or indicated for patients as a part of his practice.[1] *Id.* at 3–4. The Government also

21

---

22

[1] Plaintiff objects to the Government's September 30, 2021 declaration from Dr. Dagher attached to the Government's brief, which in relevant part states that Dr. Dagher's practice includes the assessment of whether surgery is medically necessary (Dkt. No. 80, ¶ 5), as new evidence provided after the close of discovery that is prejudicial to Plaintiff. Dkt. No. 83, at 2. But Dr. Dagher engaging in surgical referrals is not new information. Plaintiff has examined Dr. Dagher on his surgical referrals, including what he considers in determining whether a person requires a surgical referral. Dkt. No. 66-3, at 5–6 (excerpt of Dr. Dagher's August 12, 2021 deposition); *see*

23

24

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 5

1   argues that Dr. Dagher's "practice and role as a physiatrist also involves assessing if there is a

2   causal relationship between an event and a medical condition." *Id.* at 4.

3        First, the Court agrees with the Government that Dr. Dagher has the relevant expertise to

4   opine on whether any of Plaintiff's surgeries were medically necessary or indicated.

5   Dr. Dagher's experience in the evaluation of surgical necessity in patients with musculoskeletal

6   and neurological injuries provides him with the required expertise to opine on whether Plaintiff's

7   surgeries were necessary or indicated, provided that the Government is able to otherwise

8   establish the proper foundation at trial. *See Barcelon v. Harris*, 2021 WL 2210842, at *6 (D.

9   Nev. June 1, 2021) ("Dr. Kim is likely qualified as an expert to render the opinion [on the

10  plaintiff's need for spine surgery]. . . . While Dr. Kim is not a spine surgeon himself, any training

11  Dr. Kim lacks beyond the foundational minimum goes to the weight, rather than the

12  admissibility, of the opinion.").

13       The Court also agrees with the Government that Dr. Dagher's acknowledgment of "a

14  measure of subjectivity" in forming medical opinions (Dkt. No. 65, at 5), while also providing

15  his own opinion, does *not* mean that the two opinions are "two entirely polar opposite positions

16  that are irreconcilable with each other" (Dkt. No. 83, at 3). Dr. Dagher may provide his own

17  opinion based on his expertise while acknowledging that other medical professionals may

18  disagree. *See, e.g.*, *Daubert*, 509 U.S. at 590 ("[A]rguably, there are no certainties in science.").

19  At most, this goes to the Court's consideration of weight, not Dr. Dagher's ability to provide an

20  opinion.[2]

21

22  *also* Dkt. No. 83, at 2–3. For reasons explained below, the Court also does not rely on the portion of the declaration regarding Dr. Dagher's experience in causation analysis. *See* Dkt. No. 80, ¶ 6. Therefore, Plaintiff's objection to the September 30 declaration is moot.

23

24  [2] Plaintiff also argues that, given this "concession" from Dr. Dagher, "the record is abundantly clear that it is within Dr. Chen's discretion to perform the surgeries" and the surgery "should be deemed appropriate and not

Whether Dr. Dagher is qualified to opine on causation, the second type of opinion that the Government offers him to provide, is a more difficult call. In stating that Dr. Dagher engages in causation analysis as a part of his practice (Dkt. No. 78, at 4), the Government relies on the following portion of Dr. Dagher's September 30, 2021 declaration:

> As a medical professional relying upon my education, training, knowledge, skills, and experience, I also can be called upon to make a determination as to a causal relationship between an event and a medical condition. Causation analysis is not as simple as a temporal association between an event and an outcome . . . [it] requires application of widely-used research and scientifically-based principles . . . .

Dkt. No. 80, ¶ 6. These statements are conclusory and do not provide factual evidence that might aid the Court in evaluating Dr. Dagher's expertise. *See, e.g.*, *Acevedo v. Russell Cellular, Inc.*, 2021 WL 973949, at *7 (E.D. Cal. Mar. 16, 2021) (quoting *Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015)) ("The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence."), *adopted by* 2021 WL 2003099 (E.D. Cal. May 19, 2021). Dr. Dagher does not state that he *is* in the habit and practice of analyzing whether certain injuries were caused by a specific event—only that he "*can* be called upon" to do so (emphasis added). His explanation of causation analysis also sheds no light into his own experience and background in such analysis. Dr. Dagher does not mention—nor does the Government cite to—any specific education, training, or other bases of knowledge for his expertise in engaging in such causation analysis (as opposed to, for example, diagnosing and treating injuries).

Plaintiff does not address Dr. Dagher's qualification to opine on causation in his reply brief or otherwise. At this time, the Court only has snippets of deposition testimony and other

---

unnecessary." Dkt. No. 65, at 5. This factual argument is not properly raised in a motion *in limine*, and the Court defers making such a finding.

evidence to evaluate this issue independently. While the current record seems thin, the Court will

defer ruling on Dr. Dagher's qualifications to offer his causation opinions at this time. *Cf.*

*Pierson v. Ford Motor Co.*, 2008 WL 7084522, at *3 (N.D. Cal. Aug. 1, 2008) (deferring

*Daubert* ruling on causation expert testimony due to insufficient information), *supplemented by*

2008 WL 7074289 (Oct. 3, 2008), and 2009 WL 1034233 (Apr. 16, 2009).

Accordingly, the Court DENIES Plaintiff's request to exclude Dr. Dagher's expert opinions

on the bases asserted by Plaintiff and otherwise defers ruling on the admissibility of Dr. Dagher's

testimony at this time.

### 2. Dr. Bays's opinions

Plaintiff argues that Dr. Bays lacks any recent experience in performing spinal surgeries

and so lacks the specific knowledge, skill, and experience required to opine on Plaintiff's lumbar

surgery. Dkt. No. 65, at 5–6. The Government counters that Dr. Bays is a surgeon with extensive

experience in the general relevant field of orthopedics who also has been trained in spine surgery

(though he stopped performing them in 1999). Dkt. No. 78, at 6–7. As with Dr. Dagher, the

Government also argues that Dr. Bays's opinion, which goes to a causation analysis between

Plaintiff's August 2016 lumbar surgery and the November 2012 collision, is not so related to the

specifics of the 2016 surgery that Dr. Bays's lack of recent experience in spine surgery would be

relevant. Dkt. No. 78, at 6–7. The Court agrees with the Government: specifically, that Dr.

Bays's lack of experience performing spinal surgeries since 1999 does not disqualify him from

opining on Plaintiff's lumbar surgery. As with Dr. Dagher, Dr. Bays is not offered to testify on

the spinal surgery itself.

Also, as with Dr. Dagher, the support for Dr. Bays's qualifications in opining on the

cause of Plaintiff's injuries seems thin. But Plaintiff barely responds to this issue (aside from a

passing, conclusory sentence, Dkt. No. 83 at 4), and the record remains limited at this stage.

1    Accordingly, Plaintiff's request to exclude Dr. Bays's opinion on the bases asserted by

2    Plaintiff is DENIED. The Court defers ruling on the admissibility of Dr. Bays's testimony at this

3    time.

4    **B.    The Government's *Daubert* Motion**

5    The Government moves to exclude the opinions of Ms. Johnson on the basis that:

6    (1) Ms. Johnson's opinions regarding Plaintiff's lost earning capacity are based on critical

7    analytical gaps (Dkt. No. 69, at 3–6); (2) Ms. Johnson's vocational testing was reflected in a

8    second report that was submitted too late and should be stricken (*id.* at 6–7); and

9    (3) Ms. Johnson's life care plan for Plaintiff is not based on sufficient facts or data (*id.* at 7–11).

10    Plaintiff counters that: (1) Ms. Johnson's calculation of Plaintiff's estimated earning

11    capacity is not overly speculative and does not have to reflect Plaintiff's past earnings and work

12    history (Dkt. No. 74, at 3–5); (2) that Ms. Johnson's supplemental report is permissible as

13    substantially justified or harmless (*id.* at 5–6); and (3) Ms. Johnson's life care plan is based on

14    adequate foundation for admissibility (*id.* at 6–9).

15    **1.    *Earning Capacity***

16    The issue here is whether Ms. Johnson's opinions on Plaintiff's earning capacity are

17    reliable. The crux of the Government's criticism goes to the different ways in which Ms. Johnson

18    might have weighed various details of Plaintiff's employment and income history prior to the

19    2012 collision as well as Ms. Johnson's purported failure to independently verify Plaintiff's

20    recounting of his work history and income. *See* Dkt. No. 69, at 3–6. In particular, the

21    Government argues that Ms. Johnson's assessment that Plaintiff's "pre-injury earning capacity is

22    best identified with general construction work" is flawed because she had "limited knowledge of

23    his work history" from before 2012 and, from what she did know, Plaintiff had not demonstrated

24

1   any substantial measure of success or consistency in construction work to merit that assessment.

2   *See id.* at 4, 6.

3   "Reliable testimony must be grounded in the methods and procedures of science and

4   signify something beyond 'subjective belief or unsupported speculation.'" *Abarca v. Franklin*

5   *Cty. Water Dist.*, 761 F. Supp. 2d 1007, 1021 (E.D. Cal. 2011) (quoting *Daubert*, 509 U.S. at

6   590). "[A] court may conclude that there is simply too great an analytical gap between the data

7   and the opinion proffered. Nothing in either *Daubert* or the Federal Rules of Evidence requires

8   the admission of opinion evidence connected to existing data only by the *ipse dixit* of the

9   expert." *Id.* at 1022 (citation and internal quotation marks omitted) (quoting *Gen. Elec. v. Joiner*,

10  522 U.S. 136, 146 (1997)). "[T]he relevant reliability concerns may focus upon [an expert's]

11  personal knowledge or experience," particularly where the expert testimony at issue might

12  require it. *Kumho Tire Co., Ltd.*, 526 U.S. at 150.

13  As an initial matter, the Court agrees that Ms. Johnson's report often relies on Plaintiff's

14  own say-so (which is often lacking in detail) rather than verifiable records on Plaintiff's work

15  history. *See* Dkt. No. 70-1, at 6–9 (citing Plaintiff's testimony and interrogatories). But the

16  Government cites no authority to state that Ms. Johnson must independently verify Plaintiff's

17  work history. The Government is free to proffer evidence at trial that attacks the facts of

18  Plaintiff's work history, but the Court does not find Ms. Johnson's testimony to be unreliable at

19  this time for relying on Plaintiff's say-so.

20  There is also no dispute that Plaintiff's work history is highly irregular, with little

21  consistency across the various fields and jobs in which Plaintiff has worked. For example,

22  Plaintiff appears to have worked as a fish seller, real estate agent, bus driver, insurance agent,

23  various retailer positions, and various construction jobs ranging from part-time work for a

24  construction company to trying to "flip" houses in his self-owned business; Plaintiff's income

1    also appears to have fluctuated wildly, most notably from a high of $97,023.00 in 2006 to no

2    income for three consecutive years in 2008, 2009, and 2010. *See* Dkt. No. 70-1, at 6–9 (summary

3    of Plaintiff's work and income history from Ms. Johnson's report). This alone, however, largely

4    highlights the inherent uncertainty in predicting an alternate future for someone with a checkered

5    work history—something that can be addressed by "[v]igorous cross-examination" and

6    "presentation of contrary evidence" at trial. *See Daubert*, 509 U.S. at 596.

7            Instead, the primary question before the Court is whether Ms. Johnson's methodology in

8    analyzing Plaintiff's irregular work history is unreliable. This is a close call, but the Court is not

9    prepared to find that Ms. Johnson's testimony is unreliable based on the limited evidence

10   available.

11           The Government criticizes Ms. Johnson's weighing of different factors in examining

12   Plaintiff's sporadic work history, for instance by faulting Ms. Johnson for not giving weight to

13   either the degree to which Plaintiff was (or was not) "successful" at his prior construction

14   ventures or Plaintiff's earnings history in reaching her opinions. Dkt. No. 69, at 4. But the

15   Government fails to show, much less persuade, why Ms. Johnson was required to give weight to

16   these specific aspects of Plaintiff's work history.

17           Ms. Johnson does not explain why she chose to focus on certain aspects of Plaintiff's

18   work history and not others—for example, whether such choices are typical of vocational

19   assessments performed on similar individuals. But Ms. Johnson does overall represent that her

20   analysis reflects a reasonable methodology "based upon [her] knowledge, training and

21   experience combined with my professional and clinical judgments," Dkt. No. 70-1, at 2, and the

22   Court does not see "unrealistic assumptions" or other "patent flaw" (as argued by the

23   Government, Dkt. No. 69, at 5–6) in Ms. Johnson's analysis to suggest otherwise.

24

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 11

Ms. Johnson followed the "standard methodology" of vocational assessment by gathering and reviewing certain factors, such as Plaintiff's age, education, employment experience, and earnings, and apparently used her expert judgment to decide which factors to weigh heavily or not at all in reaching her conclusions. *See, e.g.*, Dkt. No. 70-1, at 15 ("standard methodology" of vocational assessment); Dkt. No. 70-2, at 23 (Ms. Johnson did not rely on Plaintiff's historical earnings because Plaintiff was not a "traditional worker" but more of "an entrepreneur" during relevant period). In doing so, Ms. Johnson seemingly focused on examining Plaintiff's prior capability to perform construction work (rather than his success as an entrepreneur in construction) and his current capability to perform other types of work (such as "semi-skilled clerical positions") based in part on Plaintiff's prior work experience, qualifications, physical limitations, and other factors. *See, e.g.*, Dkt. No. 70-1, at 15–16 (highlighting these features). And rather than basing her earning capacity calculations on Plaintiff's prior earnings, Ms. Johnson relied on the median annual wages for specific occupations published by the Washington Occupational Information System, seemingly because income from a self-owned business can fluctuate and not provide a reliable source of data. *Id.* Another vocational expert might have weighed the factors differently, but there is no "red flag" at this time to make Ms. Johnson's analysis unreliable and therefore inadmissible.

The Government relies on *Boucher v. U.S. Suzuki Motor Corp.*, a case outside of this Circuit, to argue that Ms. Johnson's analysis is too speculative to be admissible. 73 F.3d 18 (2nd Cir. 1996). There, the Second Circuit expressed deep skepticism about an expert's conclusion that a plaintiff would have continued in the job he had worked in for 15 consecutive weeks prior to the accident in question, because he otherwise had had a sporadic and unstable employment history. *Id.* at 22. The Second Circuit put little to no weight on the plaintiff's recent raise in his hourly wage and completion of a technical course for the job and concluded that plaintiff could

not have been on a charted path toward a stable, years-long career. *Id.* Regardless of whether the Court agrees with this analysis, *Boucher* notably involved a jury trial, where the danger of prejudice to the factfinder was considerably greater. Given that, the Court is reluctant to presumptively conclude at this stage that Plaintiff *could not* have pursued a career in construction work or some equivalent employment absent the 2012 collision. The Court is also prepared to factor in the uncertainties involved in Ms. Johnson's opinions, and even ultimately strike her testimony, in future proceedings if appropriate.

Accordingly, the Court DENIES the Government's motion and reserves ruling on the admissibility of Ms. Johnson's opinions regarding Plaintiff's lost earning capacity.

### 2.    *Supplemental Report & Vocational Testing*

The Court previously struck another one of Plaintiff's supplemental reports as untimely, finding that Dr. Wright's supplemental report reflected information available at the time of his original expert report and was therefore outside the scope of permissible supplementation under Federal Rule of Civil Procedure 26. Dkt. No. 91, at 4–5. Similarly, Plaintiff has failed to show that Ms. Johnson's supplemental report is based on new "additions or changes" to information contained in the first report nor that it contains evidence "intended solely to contradict or rebut evidence on the same subject matter identified by" the other party's expert witness—the permissible bases for a supplemental report. *See* Fed. R. Civ. P. 26(a)(2), 26(e)(2); *see also Sherwin-Williams Co. v. JB Collision Servs., Inc.*, 2015 WL 1119406, at *8–9 (S.D. Cal. Mar. 11, 2015) ("[A]ll of the allegedly 'new' information that Defendants seek to include in their expert's future supplementation was available well before production of the initial report, but Defendants failed to diligently retain an expert, obtain samples, conduct testing, and have their expert perform the necessary analyses."), *aff'd*, 2015 WL 13105720 (S.D. Cal. July 17, 2015).

1       The only "new" information is Ms. Johnson's administration of vocational testing on

2  Plaintiff. *See* Dkt. No. 74, at 6. Plaintiff argues that Ms. Johnson's vocational testing occurred

3  after her first report and therefore constitutes "information not available at the time of the initial

4  disclosure." *Id.* at 5–6. But this "new" information was within Plaintiff's control—the vocational

5  testing could have been conducted prior to the deadline for Ms. Johnson's first report, and

6  Plaintiff neither argues nor shows otherwise. Further, Rule 26 is intended to encompass the *duty*

7  of parties to disclose information to each other; it is not to be wielded as a runaround of agreed-

8  upon discovery deadlines. *See Sherwin-Williams Co.*, 2015 WL 1119406, at *6–7 ("Rule

9  26 creates a duty to supplement, not a right. . . . [It] does not give license to sandbag one's

10  opponent with claims and issues which should have been included in the expert witness'

11  report . . . ." (internal quotation marks omitted) (quoting *Lindner v. Meadow Gold Dairies, Inc.*,

12  249 F.R.D. 625, 639 (D. Haw. 2008))); Fed. R. Civ. P. 26 advisory committee's note to 2007

13  amendment ("[P]arties recognize the duty to supplement or correct . . . .").

14       In the alternative, Plaintiff asks that the Court exercise its discretion to find the

15  supplemental report justified or harmless and permit it. *See Yeti by Molly, Ltd. v. Deckers*

16  *Outdoor Corp.*, 259 F.3d 1101, 1106–07 (9th Cir. 2001) (affirming exclusion of expert testimony

17  that came two years after the close of discovery and less than a month prior to trial). In line with

18  the Court's prior ruling with another untimely and improper supplemental report (Dkt. No. 91, at

19  5), the Court declines to permit the untimely report here. The Court is not persuaded that

20  Ms. Johnson's supplemental report, and Plaintiff's failure to disclose it and the underlying

21  vocational testing on a timely basis, was justified or harmless.

22       Accordingly, the Government's motion to strike Ms. Johnson's supplemental report is

23  GRANTED.

24

### 3.     Life Care Plan

The issue here is whether Ms. Johnson's life care plan for Plaintiff is founded on sufficient foundational facts. Specifically, the Government "attacks the frequency and duration [of] 'estimates' contained within Ms. Johnson's life care plan." Dkt. No. 84, at 4 (emphasis removed). The Government points to Ms. Johnson's heavy reliance on Dr. Wright's treatment recommendations for Plaintiff and Dr. Wright's own "noncommittal" stance on the frequency and duration of these future treatments to argue that Ms. Johnson's estimates are unreliable, *see, e.g.*, Dkt. No. 69, at 8, as well as other indices of uncertainty and imprecision in Ms. Johnson's underlying data, *see, e.g.*, *id.* at 11 (criticizing Ms. Johnson for not investigating Plaintiff's specific household chores needs as part of her assessment of Plaintiff's future costs for household services). Plaintiff counters that Ms. Johnson's life care plan was not just based on Dr. Wright, but also her consultation with Plaintiff himself and "the evidence at hand." Dkt. No. 74, at 6–7.

Much of the Government's criticism goes to Dr. Wright's unwillingness to commit to a specific, detailed treatment plan for Plaintiff's future. But again, this goes to the uncertainty and imprecision inherent in predicting the future. The Government's criticism regarding the strength of Ms. Johnson's underlying factual bases also largely relate to the weight and persuasiveness of her opinions. The Government is free to proffer evidence at trial that attacks the facts used to support Ms. Johnson's analysis and therefore the persuasiveness of Ms. Johnson's life care plan, and the Court intends to take that uncertainty into account in weighing the evidence. Any part of the life care plan that contradicts Dr. Wright's estimations, absent other clear explanation for the departure, may be particularly susceptible to being stricken from the Court's consideration. But at this juncture, the Court is not adequately persuaded that Ms. Johnson's opinions are unreliable and must be excluded.

1    Accordingly, the Court reserves ruling on its admissibility at this time, and the

2  Government's motion to exclude Ms. Johnson's life care plan is DENIED, with the exception of

3  the portion of the life care plan that addresses Plaintiff's expected mental health treatment plan.

4  *See infra* Section III.D.3.[3]

5  **C.    Plaintiff's Motions *in limine***

6    Plaintiff argues for the exclusion of: (1) any evidence, opinion, or argument regarding

7  any pre-existing condition that may have caused Plaintiff's injuries; and (2) any evidence,

8  opinion, or argument regarding Plaintiff's failure to mitigate. Dkt. No. 99, at 1. For the reasons

9  below, and in light of the Court's preference to generally defer rulings on motions *in limine* in a

10  bench trial, the Court DENIES Plaintiff's motions *in limine*.

11    ***1.    Pre-existing condition***

12    Plaintiff's arguments regarding any pre-existing condition are inappropriate for a motion

13  *in limine*. He primarily details various parts of the Government's expert opinions to argue that

14  the Government does not have sufficient evidence to support the argument that Plaintiff had any

15  symptomatic pre-existing condition (namely, degeneration of Plaintiff's spine) that may have

16  been the alternative cause of his injuries. *Id.* at 2–3. The parties agree that a non-symptomatic

17  preexisting condition cannot constitute an alternative proximate cause of Plaintiff's injuries. *See*

18  *Harris v. Drake*, 152 Wash. 2d 480, 494 (2004) (*en banc*). To the extent that Plaintiff is arguing

19  that the Government's expert opinions on Plaintiff's pre-existing condition is inadmissible

20  because there is no evidence that any such pre-existing condition was symptomatic prior to the

---

[3] Since the Government's motion to exclude Ms. Johnson's opinions (Dkt. No. 69) was filed, the Court has issued an order holding that Dr. Wright's opinions regarding Plaintiff's hip surgery and mental health treatment, among others, are excluded for lack of relevant expertise. Dkt. No. 91, at 6. The Government has separately moved to exclude, and the Court discusses below, Ms. Johnson's life care plan to the extent that it relies almost exclusively on Dr. Wright's opinions on these issues.

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIIINE - 16

2012 collision, this appears to be, in part, based on Plaintiff's own interpretation of the evidence. *See, e.g.*, Dkt. No. 99, at 3 (arguing that Dr. Dagher's observation of anterior calcification of Plaintiff's cervical spine in x-rays taken before and after the collision does not show spinal degeneration). The Government also represents that its expert opinions on Plaintiff's spinal degeneration will be relevant for other purposes. *See* Dkt. No. 113, at 3–4. Given all of this, the Court will defer ruling on the admissibility of the Government's evidence on any pre-existing condition at this time.

In any event, to the extent Plaintiff challenges the sufficiency of an affirmative defense raised by the Government, the proper manner to raise that would have been through a motion for summary judgment. While Plaintiff filed a timely Motion for Partial Summary Judgment (Dkt. No. 63), he did not raise this issue in it and cannot do so now via a motion *in limine*. *See, e.g.*, *Liu v. State Farm Mut. Auto. Ins. Co.*, 2021 WL 717540, at *1 (W.D. Wash. Feb. 24, 2021) ("[A] motion in limine should not be used to resolve factual disputes or weigh evidence."); *Coppi*, 2014 WL 12589639, at *3 ("Nor should a motion in limine be used as a substitute for a motion for summary judgment.").

Plaintiff also requests that any opinion regarding the existence of any pre-existing condition be stricken pursuant Federal Rule of Evidence 702. Plaintiff filed a timely *Daubert* motion challenging the testimony of the very two experts that are the subject of his motion *in limine*. Dkt. No. 65. Plaintiff did not raise this issue in those expert challenges. As the time for challenging expert opinions has passed, the Court declines to permit Plaintiff to belatedly raise new challenges to the experts in a motion *in limine*.

Accordingly, Plaintiff's motion *in limine* is DENIED as to his pre-existing conditions.

1        2.      *Failure to mitigate*

2        Plaintiff argues that the Government has failed to "present competent evidence that the

3    Plaintiff failed to mitigate" his damages and so should be precluded from offering any evidence,

4    opinion, or argument regarding Plaintiff's failure to mitigate. Dkt. No. 99, at 3. Based on

5    Plaintiff's review of the Government's expert opinions, Plaintiff represents that the Government

6    has failed to meet a number of evidentiary standards needed to show Plaintiff's failure to

7    mitigate his injuries. *Id.* at 4. Plaintiff also argues that Dr. Brad Bates's opinions regarding

8    Plaintiff's "maximum medical improvement" ("MMI") are irrelevant to any arguments regarding

9    Plaintiff's duty or failure to mitigate. *Id.* at 5.

10       An argument that a party has not provided sufficient evidence to prove something is not

11   an argument for the inadmissibility of evidence and therefore is not appropriate for a motion *in*

12   *limine*. *See, e.g.*, *Liu*, 2021 WL 717540, at *1; *Coppi*, 2014 WL 12589639, at *3. The Court also

13   does not find Dr. Bates's opinions or other evidence that Plaintiff objects to so clearly irrelevant

14   to the issues at hand that they warrant exclusion at this stage.

15       Again, as with his request to exclude evidence regarding a possible pre-existing question,

16   Plaintiff's argument is essentially an out-of-time motion for summary judgment or challenge to

17   expert testimony. But Plaintiff failed to raise these at the appropriate time and is not permitted to

18   do so now through a motion *in limine*.

19       Accordingly, Plaintiff's motion *in limine* is DENIED as to his duty or failure to mitigate his

20   injuries.

21   **D.    The Government's Motions *in limine***

22       The Government argues for the exclusion of: (1) Plaintiff's efforts to seek any damages

23   not disclosed during discovery; (2) any testimony or evidence on medical conditions for which

24   Plaintiff has no admissible expert medical testimony—namely, Plaintiff's hip and urological

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 18

issues; (3) Ms. Johnson's life care plan, to the extent it reflects Plaintiff's expected future

psychological and psychiatric care; (4) any testimony or evidence regarding the cost of property

damages from the 2012 collision; and (5) any evidence or testimony regarding Plaintiff's

medical bills. For the reasons below, and in light of the Court's preference to generally defer

rulings on motions *in limine* in a bench trial, the Government's motions are GRANTED in part and

DENIED in part.

### 1. *New Damages*

The Government argues that Plaintiff is foreclosed from requesting any damages that

Plaintiff did not disclose as a part of its initial disclosures. Dkt. No. 101, at 2–4. Plaintiff

provided the following damage computation as a part of his initial disclosures: "pain suffering

[*sic*], physical injuries, mental anguish and lost wages resulting from the accident up to

$300,000.00." Dkt. No. 102-1, at 7.[4] Plaintiff also disclosed "future economic loss of

$70,000/year," for a total amount exceeding $2 million. *Id.* Subsequently, Ms. Johnson provided

more detailed estimates relating to Plaintiff's lost earning capacity, vocational retraining, and

costs associated with a preliminary life care plan. Dkt. No. 70-1. The Government argues that

Plaintiff may not seek damages beyond what Plaintiff has so far disclosed. Dkt. No. 101, at 2–4.

Plaintiff counters that the Government has been on notice of Plaintiff's total claim

amount of $300,000 since the beginning of the case, that Plaintiff's ability to seek any damages

above that amount were limited while Plaintiff's motions to amend his claim amount were

pending,[5] and that the appropriate sanction is to only preclude any previously undisclosed

*specific* computed damages amount from being presented at trial. Dkt. No. 111, at 1–2; *see also*

---

[4] During discovery, Plaintiff also claimed a certain sum for medical specials, but the Court has held Plaintiff may not seek his medical expenses in this case. Dkt. No. 92, at 6.

[5] On March 21, 2022, after the close of discovery, the Court granted Plaintiff's motion to amend his sought-after total claim amount from $300,000 to $3 million. Dkt. No. 125.

1    *Wong v. Seattle Sch. Dist. No. 1*, 2018 WL 4630385, at \*5–6 (W.D. Wash. Sept. 27, 2018)

2    (excluding plaintiffs' late-disclosed damages calculations but permitting plaintiffs to seek an

3    unspecified sum of emotional distress damages, which are difficult to compute).

4         Federal Rule of Civil Procedure 26(a)(1)(A)(iii) requires parties to disclose "a

5    computation of each category of damages claimed . . . ." The purpose of this is to "promote

6    transparency in litigation and [inform a party's] decision on whether to pursue litigation or an

7    early settlement." *Reed Constr., Inc. v. James River Ins. Co.*, 2012 WL 13024803, at \*1 (W.D.

8    Wash. Apr. 6, 2012). "[Federal Rule of Civil Procedure] 37(c)(1) gives teeth to these

9    requirements by forbidding the use a trial of any information required to be disclosed by Rule

10    26(a) that is not properly disclosed." *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d

11    1101, 1106 (9th Cir. 2001). To avoid this sanction, the party who has failed to comply with the

12    initial disclosure requirements has the burden to show that its failure "was substantially justified

13    or is harmless." Fed. R. Civ. P. 37(c)(1).

14         *Wong v. Seattle School District No. 1*, a case from this District, is particularly on point.

15    There, the plaintiffs also failed to disclose their damages computations in their initial disclosures

16    under Rule 26(a) and continually delayed providing computations of damages, except for some

17    generalized estimations totaling approximately $1.55 million. 2018 WL 4630385, at \*4. The

18    defendant requested a more precise damages calculation, which the plaintiffs refused on the

19    grounds that discovery was ongoing. *Id.* Shortly before trial and over one year after the

20    completion of discovery, the plaintiffs revised their high-level damages computations to total

21    approximately $5 million. *Id.* Finding that the plaintiffs had "failed to timely disclose their

22    damages computations under Rule 26(a), and failed to rectify this error during discovery," the

23    court prohibited plaintiffs from introducing evidence of actual or consequential damages under

24    Rule 37(c)(1). *Id.* at \*6. Notably, however, the court recognized that emotional distress damages

are difficult to quantify and need not be precisely computed; therefore, the court permitted

plaintiffs to seek a non-specified sum of emotional distress damages at trial, provided that such

an effort was only based on evidence produced prior to the close of discovery. *Id.*

Indeed, other courts in this Circuit have found that general damages, such as pain and

suffering and other types of "intangible" damages, do not need precise computations to satisfy a

party's Rule 26(a) obligations. *See, e.g.*, *Burnett v. United States*, 2016 WL 8732344, at *4 (C.D.

Cal. Aug. 17, 2016) (plaintiff's generic disclosures consisting of $700,000 of "intangible

damages" such as "pain and suffering[,] physical disfigurement[,] physical impairment[,] mental

anguish[,] and lowered quality of life" were sufficient under Rule 26), *adopted by* 2016 WL

8738996 (C.D. Cal. Aug. 19, 2016); *Iguarta v. Mid-Century Ins. Co.*, 2017 WL 1013869, at *2

(D. Nev. Mar. 14, 2017) ("[B]y definition, general damages are not susceptible to precise

computations. Given their non-pecuniary nature, and the fact that Plaintiff did disclose extensive

medical records and other information sufficient to describe the nature of the alleged injuries,

Defendant cannot claim that it was deprived of any useful information . . . .").

Plaintiff's initial disclosures included some "intangible" damages (such as pain and

suffering and mental anguish) and other non-intangible damages (such as "physical injuries"—

presumably the cost of medical care—and lost wages) for a total of $300,000. Plaintiff did not

specify how much he was seeking of the "intangible" damages, which do not otherwise need to

be broken down, and how much he was seeking of the more quantifiable damages, which should

have been computed with more specificity. The Court finds that such error was largely harmless,

because: (1) the Government has been on notice of Plaintiff's estimates for lost wages (or at

least, lost earning capacity) and other specific damages from Plaintiff's "economic loss" initial

claim and the report of Plaintiff's expert witness, Ms. Johnson; (2) the Court has already ruled

Plaintiff may not seek the cost of his medical care (*i.e.*, "physical injuries"); (3) the remainder of

Plaintiff's disclosed damages constituted "intangible" damages, which cannot be easily quantified, especially at the initial disclosures stage; and (4) the Government has been on notice throughout the litigation (until recently, as addressed below) that its maximum exposure in this case is $300,000, Plaintiff's original administrative claim amount.

This case is uniquely situated, however, in that Plaintiff was permitted to seek $3 million for his FTCA claim after the close of discovery.[6] Dkt. No. 125, at 2, 6 (permitting Plaintiff to increase his claim amount solely for potential damages arising out of his back surgery); Dkt. No. 93 (rejecting Plaintiff's other bases for increasing his claim amount). Plaintiff has therefore been justified in not being able to disclose any computation of damages beyond $300,000 until recently. This is also largely harmless error, because: (1) the Government has been on notice of Plaintiff's intent to seek a significantly higher claim amount than $300,000 at least since Plaintiff's first motion to amend the claim amount, filed on August 19, 2021 (Dkt. No. 57, at 1 (seeking an increased claim amount of $6 million)); and (2) Plaintiff has not moved to reopen discovery on any damages he might seek above the original $300,000 figure and, therefore, is still limited to the evidence he has already disclosed, with the possible exception of Plaintiff's declaration submitted with his last motion to amend the claim amount that contained potentially relevant details (Dkt. No. 118)—which the Government did not object to as untimely.[7]

Based on the foregoing, the Court finds that the purpose of Rule 26(a) disclosures is best achieved by: (1) precluding Plaintiff from putting forth and seeking any specific damages he has not already introduced, except with regard to his back surgery; (2) permitting Plaintiff to seek "intangible" damages *not* related to his back surgery up to a total sum of $300,000, minus any

---

[6] The Government argued that Plaintiff's motion to mend the claim amount should be addressed after the close of discovery. *See* Dkt. No. 46 at 11.

[7] The Government did object to the declaration as contradictory to other evidence, which the Court rejected. Dkt. No. 125, at 5 n.2.

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 22

1    specific damages that he has already disclosed; and (3) permitting Plaintiff to seek damages

2    related to his back surgery up to a total of $2.7 million (the difference between $3 million and

3    $300,000) based upon evidence disclosed during discovery.[8]

4    Accordingly, the Government's motion to preclude Plaintiff from seeking damages not

5    previously disclosed is GRANTED in part and DENIED in part.

6    **2.    *Plaintiff's Hip and Urological Issues***

7    The Government argues that Plaintiff has no admissible expert testimony regarding the

8    nature and cause of his hip injuries and urological issues; therefore, Plaintiff should purportedly

9    be precluded from offering any testimony regarding these issues, as they would be irrelevant,

10   "purely speculative[,] and thus prejudicial to the United States" absent expert testimony. Dkt.

11   No. 101, at 5–6.

12   As an initial matter, Plaintiff represents that he will not present arguments based on his

13   urological symptoms (Dkt. No. 111, at 3), rendering the Government's motion on this point

14   moot.[9] As for the hip injury, Plaintiff counters that expert testimony is not required to (1) testify

15   as to his own experience with his hip injuries and (2) introduce evidence regarding the purported

16   timing of when the hip injuries (or at least their symptoms) occurred—that is, before or after the

17   2012 collision. *Id.* The Court agrees.

18

19

20   _____

21   [8] The potential prejudice to the Government by raising its exposure in the case relatively soon before trial is
     mitigated by the significant limitation that any damages amount that Plaintiff recovers above $300,000 must be
     directly tied to Plaintiff's back surgery, the only basis upon which Plaintiff was permitted to seek a higher claim

22   amount. *See, e.g.*, *Resnansky v. United States*, 2015 WL 1968606, at *10 (N.D. Cal. May 1, 2015) ("[I]f 'recovery in
     excess of the amount originally sought in an administrative claim is justified, the plaintiff may only recover to the
     extent that the increased amount is attributable to the newly discovered evidence or intervening facts.'" (quoting

23   *Craig v. United States*, 2002 WL 31115604, at *5 (N.D. Ill. Sept. 23, 2022))).

     [9] Plaintiff also has agreed to not introduce evidence related to complex regional pain syndrome, any diagnosis
24   related to the hip, or his hip surgery during trial. Dkt. No. 101, at 5.

1    Expert medical testimony is usually necessary (to show causation) only where "obscure

2    medical factors . . . beyond an ordinary lay person's knowledge" are involved; indeed,

3    "Washington courts have specifically rejected the argument that 'only medical testimony can

4    show causation.'" *Fox v. State Farm Ins. Co.*, 2016 WL 1046128, at *3 (W.D. Wash. Mar. 16,

5    2016) (quoting *Ma'ele v. Arrington*, 45 P.3d 557, 561 (Wash. Ct. App. 2002)). Without the full

6    evidence before the Court, it is difficult to say whether one might conclude without expert

7    testimony that Plaintiff's hip injuries were caused by the 2012 collision, but at this juncture it

8    seems at least plausible that some inference *could* be drawn from Plaintiff's testimony at trial.

9    Accordingly, the Government's motion to exclude Plaintiff's testimony regarding his hip

10    injuries and urological conditions is DENIED.

11        **3.    Future Psychological and Psychiatric Care**[10]

12    The Court has previously held that Dr. Wright's opinions regarding Plaintiff's mental

13    health conditions and treatments are inadmissible. Dkt. No. 91, at 6. The Government argues that

14    the portions of Ms. Johnson's life care plan that rely on Dr. Wright's opinions regarding

15    Plaintiff's mental health treatments should be excluded, given that Ms. Johnson relied on

16    Dr. Wright to determine what mental health treatments may be required for Plaintiff in the

17    future. Dkt. No. 101, at 7. Plaintiff's argument primarily rests on Ms. Johnson having generally

18    relied on other sources in addition to Dr. Wright in crafting her life care plan. Dkt. No. 111, at 4.

19

20

21    [10] The Government purportedly seeks to preclude Plaintiff from "offering testimony and seeking damages regarding future psychological and/or psychiatric care" more broadly. Dkt. No. 101, at 1 (list of motions *in limine*). But the

22    body of the Government's brief only focuses on Ms. Johnson's life care plan. *Id.* at 7–8. "Motions in limine that seek exclusion of broad and unspecific categories of evidence are generally disfavored." *Coppi*, 2014 WL

23    12589639, at *3. Given the Government's briefing and this principle, the Court only examines the Government's motion *in limine* in relevant part as it relates to Ms. Johnson's report. In doing so, the Court permits the Government to raise this belated challenge to expert testimony in light of the intervening Court order, issued after the parties'

24    *Daubert* motions, ruling on the admissibility of Dr. Wright's opinions on mental health treatments. Dkt. No. 91.

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 24

Plaintiff does not deny that Dr. Wright is not qualified to opine on Plaintiff's mental health issues, and so any evidence that almost entirely relies on Dr. Wright's opinions regarding such is also inadmissible. While it is true that Ms. Johnson appears to have collected the underlying facts for her life care plan from more than just Dr. Wright,[11] she specifically consulted with Dr. Wright—and no other medical professional—to determine Plaintiff's mental health treatment plan. *See* Dkt. No. 102-4, at 8 (Ms. Johnson's deposition). Ms. Johnson's mental health treatment plan is therefore founded upon Dr. Wright's unqualified—and therefore inadmissible—opinions regarding Plaintiff's mental health treatments.

Accordingly, the Government's motion to exclude portions of Ms. Johnson's life care plan that opine on Plaintiff's expected mental health treatment plan is GRANTED.

### 4.    Property Damage

The Government argues that, because liability is not an issue for trial and Plaintiff will not be requesting property damage, certain evidence of Plaintiff's property damage from the 2012 collision should be excluded. Dkt. No. 101, at 8. Evidence of any property damage from the 2012 collision, however, may be relevant and probative (though likely not conclusive) to the scale and nature of the 2012 collision and, by relation, the nature and extent of the injuries Plaintiff suffered. This is particularly significant given that the Government intends to argue that Plaintiff sustained "minor" injuries from the 2012 collision. *See* Dkt. No. 113, at 3. Given that this is a bench trial, the Government's concerns regarding potential prejudice to the United States are also minimized.

Accordingly, the Government's motion as to property damage is DENIED.

---

[11] Plaintiff points to Ms. Johnson obtaining Plaintiff's history of mental-health-related medications from Plaintiff himself (Dkt. No. 111, at 4), but the Court finds—even under the liberal motion *in limine* standard applied throughout this order—that this is too weak a foundation on its own for Ms. Johnson to have determined Plaintiff's future mental health treatment plan.

1          ### 5.    *Medical Bills*

2          The Court has already ruled that Plaintiff may not seek to recover the cost of his past

3  medical bills. Dkt. No. 92, at 5. Plaintiff has indicated, however, that he may nonetheless

4  introduce the medical bills as evidence of his medical treatment, as they show the dates and

5  locations of certain of Plaintiff's treatments in a more concise way than the "thousands of pages

6  of medical records" otherwise in the record (Dkt. No. 111, at 5), and he has agreed to redact the

7  amounts reflected on the bills. Dkt. No. 101, at 9. The Government argues that the medical bills

8  are irrelevant and duplicative of other medical records and so should be excluded. *Id.*

9          Putting aside the contradiction in arguing that something is both irrelevant and

10  duplicative of other relevant evidence, the Court does not have sufficient information to rule that

11  the medical bills are either irrelevant or cumulative evidence. For example, it remains to be seen

12  whether Plaintiff will even introduce the medical bills at trial; it may also be that the bills are

13  relevant for the purposes of providing additional details or confirmation (or refutation) of

14  Plaintiff's injuries, medical treatments, and the relevant dates of the case.

15          Accordingly, the Government's motion to exclude Plaintiff's medical bills is DENIED.

16                                    *    *    *

17          The Court has considered the remainder of the Parties' arguments and finds them

18  unavailing.

19                          **IV.    CONCLUSION**

20          For the foregoing reasons,

21          (1) Plaintiff's motion to exclude the expert testimony of Drs. Dagher and Bays (Dkt.

22              No. 65) is DENIED;

23          (2) the Government's motion to strike and exclude the expert testimony of

24              Ms. Johnson (Dkt. No. 69) is GRANTED in part and DENIED in part;

ORDER REGARDING THE PARTIES'
DAUBERT MOTIONS AND
MOTIONS IN LIMIINE - 26

(3) Plaintiff's motions *in limine* (Dkt. No. 99) are DENIED; and

(4) the Government's motions *in limine* (Dkt. No. 101) are GRANTED in part and

DENIED in part.

IT IS SO ORDERED.

Dated this 5th day of April 2022.

_____
Tana Lin
United States District Judge