UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KA WAI JIMMY LO, | CASE NO. 2:17-cv-01202-TL |
| Plaintiff(s), | |
| v. | FINDINGS OF FACT & |
| UNITED STATES OF AMERICA, | CONCLUSIONS OF LAW |
| Defendant(s). | |

This matter was tried before the Court without a jury from May 9 to May 16, 2022. Having heard all the testimony at trial, reviewed the admitted trial exhibits, and reviewed the Parties' briefing, the Court makes the following findings of fact and conclusions of law by a preponderance of the evidence, pursuant to Federal Rule of Civil Procedure 52. The findings and conclusions below are based upon the Court's consideration of all the admissible evidence and the Court's own assessment of the credibility of the trial witnesses. Any conclusion of law denominated as a finding of fact shall be deemed a conclusion of law, and any finding of fact denominated as a conclusion of law shall be deemed a finding of fact.

# I. BACKGROUND

1.      This matter arises out of a motor vehicle collision that occurred in Renton, Washington on November 23, 2012 (the "2012 MVA"), involving Plaintiff Ka Wai Jimmy Lo and a United States Postal Service ("USPS") postal truck driven by a USPS employee within the scope of his employment.

2.      Mr. Lo brings this action against the United States of America (the "Government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2679(b)(1).

3.      Mr. Lo first filed a claim under the FTCA with USPS on November 14, 2014, seeking up to $300,000 in recovery. Dkt. No. 59-7 at 2 (FTCA claim form). Following the denial of his claim, Mr. Lo filed suit against the Government on August 9, 2017. Dkt. No. 1 (complaint).

4.      The Government does not contest liability. Dkt. No. 141 at 3.

5.      At trial, the Court was tasked with determining the appropriate amount of damages that Mr. Lo sustained as a proximate cause of the Government's negligence in the 2012 MVA and whether he failed to mitigate any such damages. Mr. Lo seeks damages for lost wages, lost earning capacity, cost of retraining, future medical expenses and related costs, and noneconomic damages. Plaintiff does not seek to recover for property damage and is barred from seeking past medical expenses. *See* Dkt. No. 141 at 3; Dkt. No. 92 at 6 (granting partial summary judgment to the Government on past medical claims).

# II. FINDINGS OF FACT

## A. The Parties

6.      Plaintiff Ka Wai Jimmy Lo is a resident of Seattle, Washington.

7.      The United States of America is the sole Defendant in this matter.

8.     The USPS employee who struck Mr. Lo's car was acting as an agent of the Government within the scope of his employment at the time of the 2012 MVA.

**B.     Before the 2012 Motor Vehicle Accident**

9.     Mr. Lo was born in Hong Kong in 1977. He moved to the United States in 1992.

10.     In 2006, Mr. Lo was involved in a minor motor vehicle collision in which another vehicle bumped his vehicle while he was stopped.

11.     Mr. Lo did not suffer any significant injuries from the collision but presented to the emergency room at the recommendation of emergency personnel at the scene.

12.     Mr. Lo complained of neck pain following the accident. A cervical X-ray showed no new fractures[1] but showed signs of degenerative changes. A CT scan of the abdomen and pelvis showed slight stenosis at the L3-4 level in Mr. Lo's lumbar spine.

13.     Degeneration is synonymous with arthritis. Degenerative changes in a spine take years to develop and can be simply caused by aging. However, trauma can also cause arthritis or degeneration.

14.     Stenosis is the narrowing of the spinal canal. It can be a congenital or degenerative condition. As the Government's expert Dr. Edward Dagher credibly opined, while stenosis can also be caused by trauma, such a case would be expected to be accompanied by significant bone injury, such as a fracture or a dislocation.

15.     Prior to the 2012 MVA, Mr. Lo did not have any notable health issues, including any neck or back pain. Mr. Lo also did not have any notable mental health issues.

---

[1] The X-ray did show calcification that suggested an old fracture, but it did not show any new fractures.

**C.      The 2012 Motor Vehicle Accident[2] and Immediate Treatment**

16.      On November 23, 2012, at approximately 2:00 p.m., Mr. Lo was involved in a motor vehicle collision with a USPS employee.

17.      The collision occurred at the intersection of 87th Avenue S. and S. 123rd Street in Renton, Washington.

18.      At the time of the collision, Mr. Lo was operating a 2011 Toyota Yaris and traveling straight and southbound on 87th Avenue S.

19.      The USPS employee, who was operating a USPS vehicle, had been traveling in the same direction on 87th Avenue S. The USPS employee pulled to the right of the road by the entrance to S. 123rd Street and was attempting a U-turn to travel north when the collision occurred.

20.      The USPS vehicle collided with the front right corner of Mr. Lo's vehicle. Mr. Lo's vehicle spun, and there was a secondary impact with the left front side of Mr. Lo's vehicle.

21.      Mr. Lo was traveling approximately 25 miles per hour at the time of impact.

22.      Immediately after the accident, Mr. Lo called Tiffany Chim, his long-term girlfriend, to tell her about the accident.

23.      Mr. Lo was transported from the scene by ambulance to the emergency room at UW Valley Medical Center for further treatment.

24.      Mr. Lo complained of abdominal pain and right-sided chest pain on the way to the hospital and at the emergency room. He also complained of pain in his right ankle.

---

[2] Paragraphs 16–21 and 23 are stipulated to by the Parties. *See* Dkt. No. 141 at 3.

FINDINGS OF FACT &
CONCLUSIONS OF LAW - 4

25.     Providers at the emergency room performed a physical examination of Mr. Lo, an X-ray of Mr. Lo's cervical spine and right ankle, a CT scan of Mr. Lo's chest abdomen and pelvis, and various lab tests.

26.     There was no evidence of acute injury, such as a fracture, or other trauma from the X-ray and CT scan. The CT scan showed degenerative changes in the lumbar spine.

27.     Mr. Lo was diagnosed with a chest muscle strain, an ankle strain, and abdominal pain and discharged with pain medication and instructions to follow up with a primary care provider.

**D.     Physical Health from November 2012 to November 2014**

28.     Following the 2012 MVA, Mr. Lo consistently experienced the following categories of pain: (1) neck pain (*i.e.*, in his cervical spine); (2) pain in his right upper extremities as well as numbness and tingling in his right arm and hand; (3) back pain, particularly in his lower back (*i.e.*, in his lumbar spine); (4) hip pain; and (5) right leg pain.

29.     Mr. Lo's pain was intense enough that he could not walk, sit, lie down, or otherwise maintain any position for a significant period of time.

30.     Mr. Lo's treatment providers reported varied levels of range of motion in his cervical and lumbar spine in the ensuing months, with at least two noting limited range of motion (on November 26, 2012 and on February 1, 2013) while another noted normal range of motion in his cervical spine (on January 17, 2013).

31.     On January 29, 2013, an MRI of Mr. Lo's lumbar spine showed degenerative changes but no evidence of acute trauma or injury. Specifically, the MRI showed disk desiccation and a small disk bulge to the left at L3-4 and L4-5, central canal stenosis, bilateral mild compression on the L4 nerve root, and bilateral osteoarthritis. Desiccated (dehydrated) disks occur over a period of years.

32.     Mr. Lo was advised by his providers that surgery was not indicated for his low back pain.

33.     Mr. Lo initially attempted to manage his pain with over-the-counter pain medication and other painkillers.

34.     As his pain persisted, Mr. Lo was prescribed painkillers and muscle relaxants. Mr. Lo found limited relief from the medication.

35.     Mr. Lo was referred to chiropractic care, massage therapy, and physical therapy.

36.     Starting soon after the 2012 MVA, Mr. Lo attended regular chiropractic sessions at Columbia City Chiropractic.

37.     Mr. Lo also attended regular massage therapy sessions at Massage Envy Spa.

38.     Starting in early 2013, Mr. Lo attended physical therapy sessions at Outpatient Physical Therapy & Rehabilitation Services.

39.     The chiropractic care, massage therapy, and physical therapy sessions only provided Mr. Lo with temporary or mild relief. Indeed, physical therapy made Mr. Lo's pain worse, and he stopped physical therapy treatment as a result.

40.     As indicated by the above findings, the records, and Mr. Lo's testimony, Mr. Lo's pain was generally at a moderate level prior to November 2014. This is also supported by Mr. Lo's ability to withstand regular chiropractic care during this period, which—as the Government's experts Dr. Patrick Bays and Dr. Dagher credibly testified—Mr. Lo could not have tolerated if he suffered from injuries that were more severe than muscle strains (such as a fracture or dislocation) at the time.

1   **E.      Escalation of Pain in November 2014**

2          41.     On or around November 25, 2014, Mr. Lo experienced an extreme spike in his

3   back pain, which radiated down to his leg. The pain was so severe that Mr. Lo was not able to

4   speak or walk.

5          42.     Mr. Lo presented to the emergency room at Valley Diagnostic the same day. He

6   was provided with painkillers and sent home.

7          43.     Three days later, on November 28, Mr. Lo presented to the emergency room at

8   Overlake Medical Center. The treating physician noted that Mr. Lo's symptoms were consistent

9   with radiculopathy, but also that the pain could have been a result of a poor pain management

10  regimen. Radiculopathy is a malfunctioning of a spinal nerve root that can cause symptoms such

11  as numbness, weakness, tingling, or pain in the area affected by the specific nerve root.

12         44.     Mr. Lo was prescribed with painkillers, which again did not significantly relieve

13  his pain. Overlake discharged Mr. Lo with instructions to follow up with Dr. Alan Brown, M.D.,

14  an orthopedic surgeon at Bellevue Bone and Joint Physicians, for further evaluation.

15         45.     MRI scans of Mr. Lo's lumbar spine taken in November 2014,[3] January 2015, and

16  November 2015 consistently showed degenerative changes in Mr. Lo's lumbar spine, including a

17  left-sided disk bulge at L3-4 and stenosis at L3-4.

18         46.     The degenerative changes in these MRI studies were generally consistent with

19  each other and the prior imaging of Mr. Lo's lumbar spine.

20         47.     Mr. Lo also continued to experience neck pain. Cervical MRI scans of Mr. Lo's

21  cervical spine taken in November 2014, January 2015, November 2015, and December 2016 also

22

23  _____

    [3] The Government appears to have submitted the incorrect image for Exhibit D-16, which does not contain the
    November 2014 MRI of Mr. Lo's lumbar spine as labeled. However, the Court is able to rely on the remaining
24  medical records and expert testimony to make findings regarding Mr. Lo's lumbar spine from the MRI.

showed degenerative changes to the cervical spine, including disk bulges, disk desiccation, and slight spinal canal stenosis.

48. In December 2014, Mr. Lo received an epidural steroid injection in his lumbar spine, at the L3-4 disk. Mr. Lo received significant but temporary relief in his back and right leg pain, but it returned to baseline within a few weeks.

49. Mr. Lo was then re-referred to physical therapy and massage therapy. Mr. Lo attended five physical therapy sessions at Outpatient Physical Therapy & Rehabilitation Services.

50. The precise cause of Mr. Lo's new pain was difficult to determine.

51. In January 2015, Dr. Brown found that Mr. Lo exhibited "bizarre pain behavior," including dry heaving and "writhing on the table," which Dr. Brown found difficult to explain and "completely out of proportion" to any objective findings.

52. The same month, Mr. Lo's lab work showed that he had high markers of inflammatory conditions that could be causing pain (including C-reactive protein, or "CRP," and the erythrocyte sedimentation rate, or "ESR"), and he was referred to an emergency room. The emergency room lab work did not show any reason for concern. However, at least one other treating physician also expressed concerns that Mr. Lo was potentially suffering from inflammatory arthritis.

53. Mr. Lo's primary care provider, Dr. Ginger Allen, M.D., at Valley Medical Center, examined Mr. Lo multiple times but was also unable to find a cause for his various pains. She found that Mr. Lo's reported pain did not match the various imaging and lab results she studied. Dr. Allen posited that Mr. Lo's pain was in part caused by his anxiety and general chronic pain, and she encouraged Mr. Lo to seek pain management and psychological treatment.

54. Dr. Allen also prescribed Mr. Lo with pain medication, which provided moderate relief for Mr. Lo's pain. Dr. Allen encouraged Mr. Lo to engage in exercise to build up his muscles, which he attempted to do with limited success.

55. In February 2016, Dr. Ray Baker, M.D., of Evergreen Surgical Center, performed a second epidural steroid injection in Mr. Lo's lumbar spine. The injection provided significant but temporary relief.

56. Mr. Lo also received cervical epidural steroid injections from Dr. David Hou, M.D., of Multicare Orthopedics and Sports Medicine, with the last one appearing to have occurred in September 2018. *See, e.g.*, P-36 at 521, 583 (September 12, 2018 records).

57. Mr. Lo experienced significant but temporary relief of his lower back, right leg, and neck pain from these injections.

**F.    Right Upper Extremities**

58. Dr. Allen, Mr. Lo's primary care physician, struggled to find an explanation for Mr. Lo's right upper extremities pain, including numbness and tingling, which had continued since the 2012 MVA.

59. In particular, Dr. Allen found no significant findings to support cervical radiculopathy, as Mr. Lo's right-arm numbness did not fit a neurological distribution: Mr. Lo reported numbness in his entire hand, which was inconsistent with a nerve root malfunction. Mr. Lo's neurological examination results were also normal.

60. Other treatment providers also explored the possibility of a brachial plexopathy in connection to his right upper extremities pain. The brachial plexus is a conglomeration of nerve roots outside the spine, located above the collarbone and running down into the armpit. A brachial plexopathy is damage to the brachial plexus, and it can result in malfunction in the corresponding limb involving multiple muscles and muscle groups.

61.     Dr. Daniel Fosmire, M.D., of Overlake Medical Center performed a nerve conduction study, MRI, and EMG of the brachial plexus to understand if Mr. Lo suffered from a brachial plexopathy. These three procedures are used to determine a diagnosis of brachial plexopathy.

62.     Mr. Lo's nerve conduction study and MRI did not show evidence of a brachial plexopathy. The nerve conduction study showed a normal result for sensory loss, which was inconsistent with Mr. Lo's subjective complaints of numbness and tingling. The MRI also showed a normal result, with no mass, nothing compressing on the brachial plexus, and the surrounding muscles presenting as normal.

63.     Mr. Lo's EMG showed reinnervation, indicating nerve damage that could be consistent with an injury to the brachial plexus or a condition called complex regional pain syndrome ("CRPS").[4] However, as Dr. Dagher credibly testified, this EMG result was not sufficient to conclude that Mr. Lo suffered from brachial plexopathy, given the normal results of Mr. Lo's MRI and nerve conduction study.

64.     Dr. Fosmire recommended that Mr. Lo undergo a stellate ganglion block. A stellate ganglion block is a procedure that involves the numbing of a chain of nerves alongside the front of the spine (*i.e.*, the stellate ganglion), which can provide temporary relief. A stellate ganglion block is also diagnostic and can assist in making diagnoses.

65.     From December 2015 to March 2016, Dr. Baker performed three right stellate ganglion blocks on Mr. Lo to diagnose and treat the suspected CRPS in Mr. Lo's arm.

66.     Mr. Lo experienced significant but temporary relief in his right arm pain from the stellate ganglion blocks.

---

[4] No medical expert provided an explanation of CRPS at trial. The Court previously excluded the opinions of Plaintiff's expert, Dr. Wright, on CRPS. *See* Dkt. No. 91.

67.     In May 2016, based on the lack of long-term progress in improving Mr. Lo's right upper extremities pain, Dr. Baker and Dr. Fosmire decided to discontinue stellate ganglion blocks. Dr. Fosmire discharged Mr. Lo from his care and recommended that Mr. Lo continue to see his primary care physician and other treatment providers as needed. Dr. Fosmire did not diagnose Mr. Lo with brachial plexopathy, CRPS, or cervical radiculopathy at the time of discharge.

**G.     2016 Lumbar Laminectomy**

68.     Mr. Lo began to see Dr. Benjamin Chen, M.D., of Multicare Orthopedics and Sports Medicine, to treat his low back, hip, and right leg pain.

69.     In August 2016, Dr. Chen reviewed another MRI of Mr. Lo's lumbar spine and believed that Mr. Lo had a disk herniation and moderate stenosis in his lumbar spine that was putting pressure on the L4 nerve root in particular, along with other mild degenerative changes in the cervical and lumbar spines. Dr. Chen believed that Mr. Lo's right leg pain was consistent with the compressed spinal nerve root at L4.

70.     Dr. Chen recommended that Mr. Lo undergo surgery on his lumbar spine, in particular to treat the L3-4 disk.

71.     Dr. Chen explained the nature and risks of the surgery to Mr. Lo, including the possible complications (including a very low chance of permanent paralysis or death) and the possibility of unsuccessful results from the surgery. A lumbar laminectomy is a common and routine surgical procedure with very low risk of permanent paralysis or death.

72.     Mr. Lo understood Dr. Chen's explanation, including that the risks of death or paralysis were slim, and decided to proceed with the surgery. Mr. Lo experienced significant fear and anxiety leading up to the surgery.

1    73.    On August 29, 2016, Dr. Chen performed a lumbar laminectomy on Mr. Lo.[5]

2 During the surgery, Dr. Chen found and corrected Mr. Lo's stenosis, particularly at the L3-4

3 level. Dr. Chen did not find a disk herniation, and he found that Mr. Lo's disk bulge was not

4 significant enough to warrant a diskectomy (the removal of a part of a disk).

5    74.    Following the surgery, Mr. Lo used crutches and was largely bedridden for

6 several weeks, but he was eventually able to navigate down the stairs after about a month.[6]

7    75.    The lumbar laminectomy was successful at treating Mr. Lo's right leg pain almost

8 immediately and completely.

9    76.    At approximately six weeks after the lumbar laminectomy, Mr. Lo reported

10 continued resolution of his right leg pain and significant relief of his lower back pain. Mr. Lo

11 was no longer on pain medication and was able to walk. He was released from physical

12 restrictions and directed to attend physical therapy sessions.

13    77.    Mr. Lo's right leg pain and the extreme levels of his lower back pain have not

14 returned since the lumbar laminectomy.

15 **H.    Subsequent Events & Medical Treatment**

16    78.    On or around May 23, 2017, Mr. Lo was involved in a hit-and-run motor vehicle

17 collision (the "2017 MVA") in which Mr. Lo's vehicle was T-boned on the driver's side.

18 Mr. Lo's vehicle was totaled as a result.

19

20

21 [5] During trial, the Court struck any of Dr. Dagher's testimony that relied on Dr. Chen's operative report. The Court therefore does not rely on Dr. Dagher's testimony related to the process and findings from the lumbar laminectomy.

22 [6] The Government objects to much of the evidence regarding Mr. Lo's recovery from the lumbar laminectomy. Dkt. No. 170 at 1. But, as Mr. Lo points out, details of the lumbar laminectomy and the recovery process have been

23 available in the medical records disclosed through discovery, and the Government had a chance to depose Mr. Lo and other treatment providers or experts on the topic but chose not to do so. In any case, as the Court ultimately concludes that the lumbar laminectomy does not arise out of the 2012 MVA and awards no damages arising out of

24 the lumbar laminectomy, the Government suffers no prejudice from the Court's consideration of such evidence.

79.     Mr. Lo experienced some amount of increased pain in his neck and lower back following the 2017 MVA. Mr. Lo attended at least 10 chiropractic sessions at Clark Chiropractic Clinic. Mr. Lo made a full recovery (that is, he returned to his baseline pain levels before the 2017 MVA) following the chiropractic sessions.

80.     On or around January 15, 2020, Mr. Lo was involved in a minor motor vehicle collision in which a vehicle in the next lane bumped into his  vehicle while Mr. Lo was driving straight. No one was injured, though Mr. Lo's vehicle required some repair. The incident was so minor that Ms. Chim could not recall it during her testimony.

81.     In July 2020, Mr. Lo underwent hip surgery for a congenital deformity, after which Mr. Lo's hip pain substantially decreased.

82.     As he credibly testified at trial, Mr. Lo continues to experience some pain in his low back, neck, and right upper extremities. Mr. Lo also experiences slight pain in his right leg.

83.     Mr. Lo continues to be under the care of Dr. Hou for pain management.

84.     In July 2019, September 2019, and March 2020, Dr. Hou performed medial branch blocks on Mr. Lo's cervical spine at C2-3, C3-4, and C4-5. Medial branch blocks are injections of an anesthetic into a joint to temporarily numb the nerve (the "medial branch") and eliminate the pain at that joint. Mr. Lo experienced temporary relief in his neck and right shoulder from the medial branch blocks.

85.     Dr. Hou also periodically administers cervical radiofrequency ablations[7] on Mr. Lo for his neck and right upper extremities pain. The ablations involve placing a very hot needle on each cervical joint identified during the medial branch blocks to disrupt the nerves. The records indicate that the last ablation occurred in 2020, though Mr. Lo testified that he had

---

[7] Mr. Lo referred to these as "nerve burning" during testimony.

undergone another ablation two or three weeks prior to trial. Mr. Lo experiences longer-term relief from the ablations than the medial branch blocks, with improved mobility in his right upper extremities in particular.

## I.     Mental Health Symptoms & Treatments

86.     Following the 2012 MVA, Mr. Lo suffered from a number of negative mental health and related symptoms, including anxiety, depression, suicidal thoughts, self-harm (including suicide attempts), paranoia, insomnia and other sleep disturbances, panic attacks, and sexual dysfunction.

87.     Mr. Lo's self-harm also included stabbing himself with scissors, biting himself, and consuming excessive amounts of alcohol.

88.     Mr. Lo began to avoid his friends because he felt that he had to hide his anxiety and depression from his friends in their presence.

89.     Based on these symptoms and conditions, Mr. Lo's treatment providers diagnosed him, at various times, with Major Depressive Disorder ("MDD") and post-traumatic stress disorder ("PTSD").

90.     Starting as early as March 2013, Mr. Lo presented these mental health symptoms to various providers and was referred to psychological services, including therapy and medication as needed. In July 2014, Mr. Lo requested a referral to mental health services for his depression.

91.     Dr. Allen repeatedly encouraged Mr. Lo to seek counseling services for his pain management. Dee Dee Vasquez, ARNP, a psychiatric nurse practitioner at NAVOS, also encouraged Mr. Lo to engage in therapy.

92.     Mr. Lo attended therapy sessions, but his attendance was not regular.

93.     From late 2014 to early 2015, Mr. Lo attended several therapy sessions at Valley Cities Behavioral Health Care.

94.     From late 2015 to 2019, Mr. Lo also sought periodic but inconsistent therapy counseling at NAVOS.

95.     Mr. Lo has not attended a counseling session since 2019.

96.     Mr. Lo had a strong negative reaction to therapy.

97.     Mr. Lo testified that mental health issues are not generally understood in Hong Kong culture and that those with mental health challenges are simply considered "crazy." He testified that he himself had not understood mental health issues until he experienced them. Indeed, at a mental health assessment session at Valley Cities, Mr. Lo flagged that he is an Asian American immigrant who is not used to speaking about anxiety, depression, and other issues due to his culture. One counselor noted that Mr. Lo's articulation was difficult to understand due to his accent.

98.     Mr. Lo felt that therapy exacerbated his depression by reminding him of the 2012 MVA and its aftermath. He felt that the therapists were telling him to give up and accept that he had permanently changed after the 2012 MVA, which he found difficult to accept given his dedication to making a full recovery and returning to providing for his family.

99.     Mr. Lo saw at least two or three different counselors.

100.    Mr. Lo also received periodic mental health treatment through various medication, which provided Mr. Lo with moderate relief.

101.    Mr. Lo had other stressors in his life following the 2012 MVA that contributed to his mental health issues, including an ongoing custody, childcare, and child support dispute with his ex-wife, his family's absence during family trips, and this litigation.

**J.     Employment History**

102.     Prior to the 2012 MVA, Mr. Lo worked in a wide range of jobs, including bus driver, retail salesperson, barista, short-order cook, freight handler, insurance agent, and real estate agent. He has also held a real estate agent license and an insurance agent license, both of which are now expired.

103.     In or around 1999, Mr. Lo began to "flip" or develop real property by purchasing real property, renovating it (or building a new house on the land), and then usually selling the property. Mr. Lo worked on several properties, including building the house that he and his family currently live in. Mr. Lo performed much of the construction or renovation work himself.

104.     From approximately 2005 to 2008, Mr. Lo worked on developing two properties.[8] One resulted in a profit ($18,910), while the other, which suffered damage from a fire from its resident renters, resulted in foreclosure in or around 2009 because Mr. Lo struggled to rent or sell the property in a then-bad housing market.

105.     Mr. Lo also owned or operated a dessert store for approximately a year in 2007 and 2008 and an aquarium store for approximately two years, selling the store in 2011.

106.     From 2008 to 2012, Mr. Lo reported, at most, approximately $2,000 a year in income (excluding capital gains). More specifically, according to his tax records, Mr. Lo's adjusted gross income between 2006 to 2012 was as follows: $52,924 in 2006, $70,982 in 2007, no income in 2010,[9] $20,874 in 2011 (of which approximately $19,000 was capital gains from the sale of real property), and $2,074 in 2012.

---

[8] More specifically, Mr. Lo's second property comprised of two separate lots, one of which was a vacant lot that was sold and the other contained the building that Mr. Lo eventually foreclosed on.

[9] The Parties stipulated to Mr. Lo's tax records for, among other years, 2008 and 2009 (*see* Dkt. No. 141 at 9 (pretrial order showing that P-13 was stipulated to)), but Mr. Lo's exhibit reflecting these records was not ultimately admitted at trial (*see* Dkt. No. 151 (showing no P-13)). While the Government's exhibit of Mr. Lo's tax records was admitted, this version does not appear to contain records for 2008 or 2009. *See* D-167.

107.    Mr. Lo's earnings from 2011 and 2012, the two years leading up to the 2012 MVA, were largely from self-employment in various construction "side projects," earning a couple hundred dollars per project. Mr. Lo did not work on "flipping" or developing property during this time. This was in part due to Mr. Lo's decision to stay home and take care of his two young children.

108.    Following the 2012 MVA, Mr. Lo did not find significant employment until 2017, when he began to work in kitchen cabinet sales. In 2017, Mr. Lo also attempted to restart a construction business, but he did not work on any projects or generate any income from the business.

109.    According to his tax returns, Mr. Lo earned $1,935 in 2013, $828 in 2014, $2,548 in 2015, $1,800 in 2016, $7,730 in 2017, $4,763 in 2018, and $9,953 in 2019.

110.    After working in cabinet sales for a few months, Mr. Lo worked part-time as an office manager in the small real estate office of Ms. Kimberly Tso, a mentor and friend, from approximately June 2018 to February 2020, when Mr. Lo was laid off due to the COVID-19 pandemic.

111.    Mr. Lo received unemployment benefits from early 2020 to early 2021, collecting approximately $25,000 a year. To do so, he attested to his physical ability to work, as unemployment benefits are not available to those who are disabled and unable to work.

112.    From early 2021 to the beginning of 2022, Mr. Lo worked once a week as a bartender, at a restaurant owned by Ms. Chim's parents.

**K.    Mr. Lo's Quality of Life**

113.    Prior to the 2012 MVA, Mr. Lo had an active lifestyle.

114.    In addition to his work in construction and various stores, which required physical labor, Mr. Lo enjoyed such hobbies as running, swimming, hiking, and fishing.

115.    Mr. Lo enjoyed driving and frequently took weekend road trips with his family.

116.    Mr. Lo enjoyed taking care of aquariums of fish.

117.    Mr. Lo enjoyed cooking and cooked for his family nearly on a daily basis.

118.    Mr. Lo regularly saw friends, going out to see them every week or inviting them to his house for dinner or drinks.

119.    Mr. Lo was not able to continue leading his active lifestyle after the 2012 MVA.

120.    Following the 2012 MVA, Mr. Lo could not sleep, walk for an extended period, or maintain a sitting or lying position for a long time.

121.    Mr. Lo also felt more fatigued, depressed, and anxious. He felt withdrawn from activities he used to find enjoyable, such as fishing or social engagements.

122.    Mr. Lo lost significant weight, losing around 40 pounds of weight in the two years or so following the 2012 MVA.

123.    Mr. Lo could not fully return to fishing, one of his main hobbies, due to his right upper extremities pain and loss of sensitivity.

124.    He could no longer cook regularly due to his pain.

125.    Mr. Lo was not able to drive for several years. He became scared of driving and became particularly agitated when he saw lights from an ambulance, police, or fire truck. He also could not drive because he could not sit for an extended period.

126.    Mr. Lo and Ms. Chim have a son and daughter, aged 14 and 13 respectively at the time of trial. The four of them live together.

127.    Mr. Lo's relationship with his children has significantly suffered.

128.    Prior to the 2012 MVA, Mr. Lo went to the park or other excursions with his family every week and regularly enjoyed holding them, playing with them, and teaching them

various activities such as drawing, fishing, and swimming. Mr. Lo was closely involved in raising his children, having chosen to stay home to care for them prior to the 2012 MVA.

129.    Following the 2012 MVA, Mr. Lo has been significantly limited in his ability to interact with his children. He was often unable to attend the children's birthday parties, performances, or field trips. Mr. Lo was unable to pick up or hold his children (ages five and three at the time) following the 2012 MVA.

130.    Mr. Lo's relationship with Ms. Chim has also significantly suffered.

131.    Prior to the 2012 MVA, Mr. Lo was the primary breadwinner of his family and, as previously noted, helped take care of the young children.

132.    Due to Mr. Lo's health limits since the 2012 MVA, Ms. Chim has taken on nearly all of the household chores, childcare, driving, and other family responsibilities.

133.    The couple has experienced heightened tension in their relationship, including more frequent arguments. Mr. Lo has frequently been unable to fully engage in sexual intercourse with Ms. Chim, due to his pain and discomfort following the 2012 MVA.

134.    Mr. Lo's inability to be the primary breadwinner for the family or care for his family as he did prior to the 2012 MVA has caused Mr. Lo's self-esteem to suffer, as he feels that he is failing as a partner to Ms. Chim and father to their two children. Mr. Lo also feels that he missed critical parts of his children's lives, such as school performances and being able to pick them up while they were young enough to be picked up.

135.    Mr. Lo has a son from a prior marriage who is now 17 years old. Mr. Lo was not able to go visit his son for a period of time after the 2012 MVA due to Mr. Lo's inability to drive, which led to some deterioration of their relationship. However, Mr. Lo also admitted at trial that he had not been seeing his oldest son frequently prior to the 2012 MVA, and indeed had generally stopped seeing the son in 2011.

136.    Mr. Lo's social life has suffered since the 2012 MVA. Due to his pain, mental health symptoms, and general discomfort, Mr. Lo stopped going out to see his friends or hosting them at his house.

137.    Over time, Mr. Lo has recovered from some of his physical and mobility limitations since the 2012 MVA. For example, he accompanied his family on a road trip to California in 2015, though he required frequent stops to rest. Since 2020, Mr. Lo has accompanied his family on flights, including to Las Vegas and to Florida.

138.    Mr. Lo has also recently been able to pick back up some of the family responsibilities, such as cooking or performing yardwork, on occasion.

139.    More recently, Mr. Lo has been able to go back to hiking and gardening.

140.    Mr. Lo returned to regular driving in or around 2017. He continues to experience occasional panic attacks while driving.

141.    Recently, Mr. Lo has been teaching his son and daughter how to cook and has been able to attend outdoor events with his children.

## L.    Expert Opinions

### 1.    Medical Experts

#### a.    *Dr. Sanford Wright*

142.    At trial, Mr. Lo presented the medical testimony of Dr. Sanford Wright, M.D., a neurological surgeon.

143.    Dr. Wright's opinions were based on a January 6, 2021, physical examination of Mr. Lo, Mr. Lo's self-reported medical history, and a review of Mr. Lo's medical records. Dr. Wright's review of the medical records was primarily based on the report of a records specialist, who reviewed and summarized the medical records for Dr. Wright. During his

testimony, Dr. Wright did not identify any specific imaging or other file from Mr. Lo's medical records he personally reviewed.

144.    Dr. Wright opined that the 2012 MVA caused injury to Mr. Lo's lumbar and cervical spines (both of which had existing degenerative conditions) and stretched Mr. Lo's brachial plexus, all of which caused Mr. Lo pain in his back, neck, hip, right leg, and right upper extremities. Specifically, Dr. Wright diagnosed Mr. Lo with muscular strains in the cervical, thoracic, and lumbar areas (for up to three months following the MVA), a left-sided disk bulge in his lumbar spine at L3-4,[10] brachial plexopathy on the right side, and cervical radiculopathy on the right side, all of which he opined were caused by the 2012 MVA. Dr. Wright opined that the degenerative conditions in Mr. Lo's spine were "lit up," or aggravated, by the 2012 MVA.

145.    Dr. Wright acknowledged at trial that left-sided impingement, such as the left-sided disk bulge in Mr. Lo's lumbar spine, is generally inconsistent with extreme pain only reported on the right side of the body. Dr. Wright also admitted that in concluding that Mr. Lo had cervical radiculopathy, he primarily relied on Dr. Fosmire's EMG results but did not review the EMG itself.

146.    Dr. Wright opined on Mr. Lo's current functional limitations. He opined that Mr. Lo has permanent or long-term limitations in his ability to sit, stand, or walk for long periods of time, as well as his ability to use his upper extremities. Dr. Wright opined that Mr. Lo will likely continue to experience pain for approximately another decade.

147.    Dr. Wright did not consider the effect of Mr. Lo's other motor vehicle accidents in 2006, 2017, and 2020 in formulating his opinions. Dr. Wright testified that he understood Mr. Lo's 2017 MVA was very minor and agreed that it would have been relevant to his opinions

---

[10] Dr. Wright initially diagnosed Mr. Lo with a disk herniation but corrected his opinion at trial to a disk bulge.

1   to learn that Mr. Lo's car had been totaled in the collision. Dr. Wright was not aware that Mr. Lo

2   had attended at least 10 chiropractic appointments after the 2017 MVA. Dr. Wright also did not

3   know any details about Mr. Lo's 2006 or 2020 MVAs, including that Mr. Lo complained of neck

4   pain following the 2006 accident.

5       148.   Dr. Wright acknowledged at trial that none of Mr. Lo's treatment providers

6   ultimately diagnosed Mr. Lo with brachial plexopathy or cervical radiculopathy[11] and that no

7   provider explicitly found that Mr. Lo's degenerative spine conditions had been aggravated by the

8   2012 MVA.

9           **b.    *Dr. Edward I. Dagher***

10      149.   The Government presented the medical testimony of Dr. Edward I. Dagher, M.D.,

11  a physiatrist (*i.e.*, a specialist in physical medicine and rehabilitation).

12      150.   Dr. Dagher's opinions were based on his review of Mr. Lo's medical records,

13  including Mr. Lo's cervical and lumbar spine imaging, and Mr. Lo's deposition.

14      151.   Dr. Dagher opined that Mr. Lo primarily suffered from spinal soft tissue strains,

15  particularly in the neck and low back, consistent with whiplash-like injury, as a result of the 2012

16  MVA.

17      152.   Dr. Dagher opined that Mr. Lo recovered from these injuries in about three

18  months after the 2012 MVA, as is typical of whiplash-like injuries. However, Dr. Dagher

19  acknowledged at trial that Mr. Lo has been "consistently symptomatic" beyond the first three

20  months after the 2012 MVA.

21

22

23

24  ---
[11] Dr. Fosmire initially diagnosed Mr. Lo with potential brachial plexopathy but ultimately concluded his treatment without the diagnosis.

153.    Dr. Dagher opined that the 2012 MVA did not cause cervical radiculopathy, brachial plexopathy, lumbar disk herniation or disk bulge, or "lighting up" of prior degenerative conditions in Mr. Lo's spine.

154.    Dr. Dagher pointed to a lack of clinical and diagnostic findings, separate from Mr. Lo's subjective complaints, to support these diagnoses or causation opinions.

155.    Dr. Dagher testified that MRIs of Mr. Lo's lumbar spine showed left-sided impingement of the L3-4 disk, which was inconsistent with Mr. Lo's reported right-sided pain. Dr. Dagher also opined that the normal range of motion in the cervical and lumbar spine that Mr. Lo reported in January 2013 was inconsistent with cervical radiculopathy. Dr. Dagher acknowledged that other treatment providers around that time period, however, noted limited range of motion in Mr. Lo's cervical and lumbar spine, including in a February 1, 2013, physical therapist note that Dr. Dagher had not reviewed for his report.

156.    Dr. Dagher testified that an acute injury causing an extreme pain "spike" two years later is physiologically very rare. Dr. Dagher noted that some of Mr. Lo's prior treatment providers had hypothesized that psychological stressors or inflammatory or rheumatic conditions could be behind at least some of Mr. Lo's pain complaints since the 2012 MVA.

157.    Based on his opinion that the 2012 MVA only caused temporary injuries consistent with whiplash, Dr. Dagher opined that Mr. Lo currently does not require any medical treatment for the injuries sustained from the 2012 MVA and that Mr. Lo is medically safe and capable of any employment of his choosing.

158.    Dr. Dagher also opined that, even if he were to adopt Dr. Wright's views regarding the injuries Mr. Lo suffered as a result of the 2012 MVA, Ms. Johnson's life care plan is not supported by medical foundation and necessity because it is inconsistent with the type and frequency of treatment that Mr. Lo has received in the past.

### c. Dr. Patrick N. Bays

159.    The Government presented the medical testimony of Dr. Patrick N. Bays, D.O., an orthopedic surgeon.

160.    Dr. Bays's opinions were based on his review of Mr. Lo's medical records.

161.    Dr. Bays opined that Mr. Lo primarily sustained strains and sprains to his cervical, thoracic, and lumbar spine consistent with whiplash and whiplash-associated disorder, as well as injuries to his right shoulder, right knee, right hip, and the right ankle. Dr. Bays opined that Mr. Lo recovered from these injuries within, at most, six months after the 2012 MVA.

162.    Dr. Bays also testified that Mr. Lo has a congenital central canal stenosis in his spine, as well as degenerative changes and a left-sided disk bulge in the lumbar spine. Dr. Bays opined that these conditions were neither caused by nor aggravated by the 2012 MVA, particularly given that minor degenerative conditions were already present in Mr. Lo's cervical spine imaging in 2006. Dr. Bays also noted that the lumbar disk bulge was left-sided and did not match the right leg pain that Mr. Lo reported, though he acknowledged that Dr. Chen had found Mr. Lo's stenosis was putting pressure on the L4 nerve root, the nerve root that was decompressed during the 2016 laminectomy, on the right side.

163.    Dr. Bays opined that Mr. Lo's spinal degenerative changes were not "lit up" by the 2012 MVA because, rather than the "spike" in pain occurring just after the 2012 MVA, it took two years for the intensified pain to develop. Dr. Bays testified that asymptomatic pre-existing conditions will usually be "lit up" instantaneously, much like "flipping a light switch." He testified that he had only seen instances of injuries being "lit up" by an incident after two years if the individual developed a traumatic arthritis after suffering from a fracture or dislocation at the incident.

164.    Dr. Bays testified that Mr. Lo's pain could have been caused by an inflammatory process affecting the spine from an autoimmune disease.

165.    Dr. Bays opined that, contrary to Dr. Chen's recommendations, Mr. Lo's 2016 lumbar laminectomy had not been indicated, given the mildness of the degenerative changes on Mr. Lo's spine. He acknowledged, however, that Mr. Lo experienced significant relief in his lower back and right leg pain following the laminectomy.

### 2.    Psychological Experts

#### a.    Dr. Michelle Brown

166.    Mr. Lo also presented the medical testimony of Dr. Michelle Brown, PsyD, a licensed clinical psychologist.

167.    Dr. Brown's opinions were based on her review of Mr. Lo's medical records and a May 2021 evaluation of Mr. Lo, which included the administration of the Clinician-Administered PTSD Scale (5th edition) ("CAPS-5"), Personality Assessment Inventory ("PAI"), Trauma Symptom Inventory (2nd edition) ("TSI-2"), and the Detailed Assessment of Post-Traumatic Stress ("DAPS").

168.    Dr. Brown did not administer the Minnesota Multiphasic Personality Inventory test ("MMPI"), which broadly tests for various mental health symptoms and validity scales, because it been shown in clinical literature to over-pathologize the symptoms of clients of color. In particular, the literature shows that members of the Asian American Pacific Islander community tend to minimize their symptoms, particularly their emotional or purely psychological symptoms (as opposed to physiological symptoms). Indeed, Dr. Brown found that Mr. Lo's validity indicators showed that he was minimizing his symptoms.

169.    Dr. Brown diagnosed Mr. Lo with post-traumatic stress disorder ("PTSD") and major depressive disorder ("MDD") and opined that such disorders can have a negative effect on

one's physical pain and symptoms. Dr. Brown opined that these disorders were caused by the 2012 MVA.

170.    Dr. Brown did not believe that Mr. Lo suffers from somatic symptom disorder ("SSD"). SSD is a rare disorder characterized by an exaggerated or excessive preoccupation on of one's physical pain or other symptoms.

171.    While she agreed with Dr. Bates that Mr. Lo required therapy to treat his mental health symptoms, Dr. Brown also opined that Mr. Lo required but did not receive (and was not offered) culturally competent mental health counseling. She opined that, because trauma therapy can be very stressful, Mr. Lo did not cause himself any injury by failing to obtain consistent psychotherapy—which was not culturally appropriate when offered—for his trauma.

### b.    Dr. Brad L. Bates

172.    The Government presented the medical testimony of Dr. Brad L. Bates, Ph.D., a licensed clinical psychologist.

173.    Dr. Bates's opinions were based on a February 5, 2021, examination of Mr. Lo and his review of Mr. Lo's medical and other records, including photographs of the 2012 MVA and court documents related to Mr. Lo's older son's custody dispute.

174.    Dr. Bates administered the MMPI. Dr. Bates testified that the results of the MMPI suggested that Mr. Lo may have been engaging in both under- and over-reporting of his symptoms.

175.    Prior to administering the MMPI, Dr. Bates was aware of academic literature showing a tendency for the MMPI to show inaccurate results (specifically, tending to show erroneous diagnoses of malingering or faking symptoms) for Chinese individuals. In administering the test regardless, Dr. Bates relied on a study showing that Asian Americans in personal injury cases did not present any difference on the validity scales than the normative

group of individuals. However, Dr. Bates acknowledged that the article in question had only nine Chinese participants and no participant who had difficulty reading and completing the MMPI in English. Dr. Bates also knew of but did not administer the Chinese infrequency scale, which was constructed and validated in China and Hong Kong to evaluate faking among Chinese nationals.

176.    Dr. Bates also departed from the standard administration process for the MMPI, which usually occurs by having the respondent read and respond to each item of the MMPI on a computer or paper booklet. However, Mr. Lo struggled with the language contained in the MMPI, requiring Dr. Bates to explain approximately 21 words or phrases, such as "appetite," "keenly," "spells of the blues," and "brood," to Mr. Lo. Mr. Lo also proceeded at approximately half the typical speed of a respondent on the MMPI. Dr. Bates therefore orally administered the remainder of the MMPI to Mr. Lo.

177.    Dr. Bates administered the Test of Memory Malingering ("TOMM"), which indicated that Mr. Lo was feigning memory impairment. Dr. Bates also administered the DAPS, which tests whether a respondent endorses any of eight pseudo-symptoms that are rarely endorsed by individuals with actual mental health conditions but might be endorsed by those feigning PTSD. Mr. Lo did not endorse any of the pseudo-symptoms.

178.    Dr. Bates also administered diagnostic measures of depression (PHQ-9), anxiety (GAD-7), and trauma symptoms on Mr. Lo, which assisted in the PTSD and MDD diagnoses. He administered the pain catastrophizing scale, the perceived injustice scale, and the World Health Organization Disability Assessment Survey ("WHODAS"), which assisted in the SSD diagnosis.

179.    Dr. Bates opined that Mr. Lo suffers from MDD, PTSD, and SSD. Dr. Bates acknowledged that Mr. Lo is among the approximately one percent of individuals with experience of trauma who suffer from persistent PTSD. He also acknowledged that a patient who suffers from SSD experiences actual distress and would require treatment.

180.    Dr. Bates opined that these disorders were triggered by the *pain* that Mr. Lo experienced following the 2012 MVA, rather than by the 2012 MVA itself. Dr. Bates did not opine on whether the pain was caused by the 2012 MVA.

181.    Dr. Bates also opined that, had Mr. Lo sought early and consistent psychotherapy, especially therapy aimed at treating trauma, at the onset of his mental health symptoms (in or around July 2014), Mr. Lo would have attained improved and stable mental health symptoms by June of 2016. Dr. Bates opined that Mr. Lo did not require culturally competent therapy, given a lack of awareness or concerns about cultural competency expressed in Mr. Lo's medical records.

### 3.    Vocational and Rehabilitation Experts

#### a.    *Ms. Cloie Johnson*

182.    At trial, Mr. Lo presented the testimony of Ms. Cloie Johnson, a vocational rehabilitation counselor and case manager. Ms. Johnson presented her life care plan, which outlines each item for the anticipated future medical care for Mr. Lo as well as each item's frequency, duration, and cost. *See* D-175. Ms. Johnson also opined as to Mr. Lo's earning capacity before and after the 2012 MVA.

183.    Ms. Johnson's opinions were based on her review of Mr. Lo's responses to interrogatories and his deposition during this litigation, a June 2, 2021, interview of Mr. Lo, and the medical opinion of Dr. Wright, including as to what injuries Mr. Lo suffered as a result of the 2012 MVA, what functional limitations such injuries imposed on Mr. Lo, and what medical treatment and other accommodations are required for Mr. Lo in the future.

184.    Ms. Johnson does not have the qualifications, education, and experience necessary to render medical opinions on her own. Ms. Johnson did not review Mr. Lo's medical records, consult with his treatment providers, or compare her life care plan to the treatment Mr. Lo has received since 2012. Ms. Johnson did not conduct an independent functional

1   assessment of Mr. Lo's capability to perform household tasks and relied on Dr. Wright to

2   understand Mr. Lo's medical needs and functional limitations in employment.

3          185.   <u>Future Medical Care (Life Care Plan)</u>. In her life care plan, Ms. Johnson opines

4   that the total reasonable value of the future medical expenses and other related costs for treating

5   Mr. Lo's injuries arising out of the 2012 MVA is $287,735 to $453,329, in present cash value.

6   D-175. This encompasses:

7          a.   Physical medicine and rehabilitation evaluation and treatment, every three

8               months on average for the remainder of Mr. Lo's life, for an estimated cost of

9               $33,969;

10         b.   Pain management evaluation and treatment, every one to two months on

11              average for the remainder of Mr. Lo's life, for an estimated cost of $66,362 to

12              $132,399;

13         c.   Cervical radiofrequency ablations, every six to twelve months on average for

14              a minimum of one to two years, for an estimated cost of $1,888 to $4,720;

15         d.   Cervical epidural spine injections, every four months on average for a

16              minimum of one to two years, for an estimated cost of $2,024 to $4,047;

17         e.   Right-sided stellate ganglion blocks, every four months on average for the

18              remainder of Mr. Lo's life, for an estimated cost of $11,998 to $35,988;

19         f.   Third-party household services, for an average of six to eight hours a month

20              for the remainder of Mr. Lo's life, for an estimated cost of $90,217 to

21              $120,289; and

22

23

24

g.  Third-party services for yard work and home repair, for an average of four to six hours a month for the remainder of Mr. Lo's life, for an estimated cost of $81,277 to $121,915.[12]

186.    Ms. Johnson testified that no life care plan would be needed for Mr. Lo if it were based on the opinions of Drs. Dagher and Bays.

187.    <u>Earning Capacity</u>. Ms. Johnson testified that, absent his injuries and based on his prior work experience, Mr. Lo's earning potential would have been that of a general construction worker. Ms. Johnson explained that this was because, although his work history reflects various positions and endeavors, Mr. Lo has generally performed some type of construction work the most consistently throughout his work history, and he has the skills of a general construction worker. Based on this, Ms. Johnson opined that Mr. Lo's pre-2012 MVA earning potential was $50,838 a year.

188.    Ms. Johnson also testified that Mr. Lo's physical capacity for employment following the 2012 MVA is limited to that of working at minimum wage ($14.49 an hour) in a sedentary physical demand level capacity, for an estimated earning potential of $30,139.20 a year. Ms. Johnson's understanding of Mr. Lo's physical limitations was based on Dr. Wright's opinions.

189.    She testified that the annual difference of earning potential between the two positions is $40,698.80 per year, which represents a net present value annualized over Mr. Lo's estimated working career (as stipulated to by the Parties).

190.    Ms. Johnson opined that, alternatively, the cost of retraining Mr. Lo to restore his earning potential to that of a general construction worker would cost $120,676, which represents

[12] Ms. Johnson's life care plan for Mr. Lo excludes mental health treatment, per a prior order of the Court. *See* Dkt. No. 129 at 25.

a cost of $19,000 for tuition, books, and supplies for a two-year full-time retraining plan and two years' worth of lost wages.

191.    Ms. Johnson testified that, if her vocational recommendations were based on the opinions of Drs. Dagher and Bays, she would have concluded that Mr. Lo only suffered approximately 12 weeks of loss of wages and no loss of future wage-earning capacity. She did not offer an opinion as to the amount of lost wages during this period.

### b.    *Mr. John F. Berg*

192.    The Government introduced the expert opinion of Mr. John F. Berg, a vocational expert and rehabilitation counselor. Mr. Berg's opinions were based on his review of Mr. Lo's medical records, consultations with Drs. Dagher, Bates, and Bays, and a review of Mr. Lo's deposition.

193.    Mr. Berg opined that Mr. Lo's career prior to the 2012 MVA was that of a self-employed entrepreneur, with a developing interest in real estate, rather than that of a general construction worker.

194.    Mr. Berg opined that Mr. Lo's wage-earning capacity before *and* after the 2012 MVA was at minimum wage ($13.50 an hour), for a total full-time earning of more than $28,000 a year,[13] and therefore that Mr. Lo did not suffer any loss of wage-earning capacity after the 2012 MVA. Mr. Berg testified that Mr. Lo was on track to earn an income commensurate with his wage-earning capacity during Mr. Lo's employment at a kitchen cabinet store in 2017 and 2018. He also opined that Mr. Lo does not require retraining because he is already capable of employment, such as working as a real estate or insurance agent.

---

[13] Neither Ms. Johnson nor Mr. Berg explained the discrepancy in their respective minimum wage rates.

195.     Mr. Berg opined that, based on the opinions of Drs. Dagher and Bays, Mr. Lo suffered 12 to 13 weeks of total temporary work disability following the 2012 MVA. He did not opine as to the amount of lost wages during this period.

### III.     CONCLUSIONS OF LAW

**A.     *Daubert* Determination**

196.     The Court previously deferred ruling on certain portions of the Government's motion to exclude the expert opinion of Ms. Johnson: specifically, whether to exclude her opinion regarding Mr. Lo's lost earning capacity and life care plan (except as to Mr. Lo's mental health treatment plan, which was excluded). Dkt. No. 129 at 13, 16. The Court also previously deferred ruling on Mr. Lo's motion to exclude the expert opinions of Drs. Dagher and Bays as to causation. *Id.* at 8, 9.

197.     When considering expert witness testimony, "the district court must perform a gatekeeping role of ensuring that the testimony is both relevant and reliable under [Federal Rule of Evidence] 702." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019) (internal quotation marks omitted) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)). The reliability inquiry "requires that the expert's testimony have a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 1188–89 (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999)).

198.     Because the purpose of this inquiry is to "protect *juries* from being swayed by dubious [expert] testimony," in a bench trial "there is less need . . . to keep the gate when the gatekeeper is keeping the gate only for himself." *United States v. Flores*, 901 F.3d 1150, 1165 (9th Cir. 2018) (internal quotation marks omitted) (emphasis in original) (quoting *David E. Watson, P.C. v. United States*, 668 F.3d 1008, 1015 (8th Cir. 2012)). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

are the traditional and appropriate means of attacking shaky but admissible [expert] evidence." *Daubert*, 509 U.S. at 596.

199.    At trial, the Court heard Ms. Johnson, Dr. Dagher, and Dr. Bays testify as to their qualifications and methodology in forming their opinions. The Court also heard the testimony of Ms. Johnson as to how she determined Mr. Lo's lost earning capacity and life care plan and Drs. Dagher and Bays as to how they determined causation.

200.    All three expert witnesses provided testimony that was relevant to the determination of damages and causation. Further, all three expert witnesses were qualified to provide their opinions as to these issues. The Court finds that all three experts' opinions on these issues, including their methodology, were reliable. Therefore, all three expert witnesses' testimony was admissible, and any weaknesses in their opinions go to the question of weight.

**B.    Negligence Under the FTCA**

201.    Plaintiff asserts a claim of negligence against the Government under the FTCA.

202.    This Court has jurisdiction pursuant to 28 U.S.C. § 1346(b).

203.    Venue is proper in the Western District of Washington pursuant to 28 U.S.C. § 1402(b) because Mr. Lo resides in this judicial district and because the acts and omissions complained of occurred in this District.

204.    Under the FTCA, the Government is liable for "personal injury . . . caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

205.    Washington law governs the substance of this matter because the collision occurred in Renton, Washington. 28 U.S.C. § 1346(b)(1); *Avina v. United States*, 681 F.3d 1127,

1  1130 (9th Cir. 2012) (citing *Richards v. United States*, 369 U.S. 1, 7 (1962)) (applying California

2  law in FTCA case because events at issue occurred in California).

3      206.    The elements of negligence under Washington law are duty, breach of that duty,

4  injury, and proximate cause between the breach and injury. *E.g.*, *Nguyen v. City of Seattle*, 317

5  P.3d 518, 523 (Wash. Ct. App. 2014) ("Government entities are held to the same negligence

6  standards as private individuals.").

7      207.    The Parties do not dispute the Government's liability. The only issue that remains

8  is what injuries were proximately caused by the Government's negligence and how much in

9  damages Mr. Lo is entitled to recover. *See* Dkt. No. 141 at 3 ("The United States does not contest

10 liability but disputes the nature and extent of Plaintiff's damages.").

11      208.    The Court "must determine the amount of money that will reasonably and fairly

12 compensate the plaintiff for such damages as [the Court finds] were proximately caused by the

13 negligence of the defendant." Wash. Pattern Jury Instructions - Civil ("WPI") 30.01.01 (7th ed.).

14      209.    Proximate cause requires both (1) cause-in-fact, or "but for" causation, and

15 (2) legal causation, which is a policy determination as to how far the consequences of a

16 defendant's acts should extend. *E.g.*, *Hartley v. State*, 698 P.2d 77, 82–83 (Wash. 1985) (en

17 banc) (discussing difference between the two elements of proximate cause).

18      210.    Mr. Lo seeks noneconomic damages as well as economic damages in the form of

19 lost wages, lost earning capacity, cost of retraining, and/or future medical care (and other related

20 costs reflected in Ms. Johnson's life care plan).

21      211.    Mr. Lo's recovery under the FTCA is limited to the amount of the claim he

22 administratively filed before the USPS, "except where the increased amount is based upon newly

23 discovered evidence not reasonably discoverable at the time of presenting the claim to the federal

24 agency, or upon allegation and proof of intervening facts, relating to the amount of the claim."

1    28 U.S.C. § 2675(b). Because Mr. Lo's FTCA administrative claim was for the amount of

2    $300,000, his recovery is limited to that amount, except that he may recover up to $2.7 million in

3    any additional damages arising out of Plaintiff's 2016 lumbar laminectomy pursuant to a prior

4    order of the Court. Dkt. No. 125 at 2, 6.

5        212.    The party asserting negligence—here, Mr. Lo—must prove each of the elements

6    of negligence by a preponderance of the evidence. *See, e.g.*, *Peirce v. United States*, No. C05-

7    440, 2007 WL 1577762, at *4–5 (W.D. Wash. May 30, 2007) (finding plaintiff failed to show

8    negligence by preponderance of evidence at trial in MVA FTCA case); *see also* WPI 30.01.01.

9        213.    "Expert testimony is required to establish causation when an injury involves

10    obscure medical factors that would require an ordinary lay person to speculate or conjecture in

11    making a finding." *Bruns v. PACCAR, Inc.*, 890 P.2d 469, 477 (Wash. Ct. App. 1995); *accord*

12    *Fox v. State Farm Ins. Co.*, No. C15-535, 2016 WL 1046128, at *3 (W.D. Wash. Mar. 16, 2016).

13    Medical testimony must be based upon a reasonable degree of medical certainty. *McLaughlin v.*

14    *Cooke*, 774 P.2d 1171, 1175 (Wash. 1989).

15        214.    However, "Washington courts have specifically rejected the argument that '*only*

16    medical testimony can show causation.'" *See Fox*, 2016 WL 1046128, at *3 (emphasis added)

17    (quoting *Ma'ele v. Arrington*, 45 P.3d 557, 561 (Wash. Ct. App. 2002)) (noting that it was "not

18    immediately apparent" that expert medical testimony was necessary to find that plaintiff's head,

19    neck, and lower back pain was caused by car accident); *see also McLaughlin*, 774 P.2d at 1175

20    ("It is not always necessary to prove every element of causation by medical testimony. If, from

21    the facts and circumstances and the medical testimony given, a reasonable person can infer that

22    the causal connection exists, the evidence is sufficient."). Therefore, the Court looks at the

23    totality of the evidence presented at trial, including both the expert medical testimony and lay

24    witness testimony, to determine causation.

FINDINGS OF FACT &
CONCLUSIONS OF LAW - 35

**C.      Causation**

215.    The Court finds by a preponderance of evidence that the following injuries were proximately caused by the Government's negligence in the 2012 MVA.

    **1.      Physical Injuries**

216.    Mr. Lo suffered the following physical injuries as a result of the 2012 MVA:

        a.    cervical, thoracic, and lumbar muscular strains consistent with whiplash and related conditions, which lasted approximately three months; and

        b.    pain, including numbness and tingling, in his right upper extremities (right shoulder, arm, and hand), which Mr. Lo continues to suffer from.

        ***a.      Muscular Strains***

217.    The Parties' medical experts agree that Mr. Lo suffered cervical, lumbar, and minor thoracic muscular strains consistent with whiplash and related conditions as a result of the 2012 MVA.

218.    The experts generally agree that these injuries lasted for approximately three months. Specifically, while Dr. Bays opined that it could have taken Mr. Lo up to six months to recover, the Court notes and credits Drs. Wright and Dagher's opinions that three months is the typical period of expected recovery from whiplash and related conditions. This is also consistent with Mr. Lo's medical records.

        ***b.      Neck Pain, Lower Back Pain & Right Leg Pain***

219.    Mr. Lo failed to show that the 2012 MVA proximately caused any significant lower neck pain, back pain, right leg pain (aside from the muscular strains identified above), or other injuries to his cervical or lumbar spines.

220.    The Parties' medical experts agree that: (1) Mr. Lo had mild degenerative changes, which are caused by aging, in his cervical and lumbar spine since before the 2012

MVA, including central canal stenosis in his cervical and lumbar spines and a left-sided disk bulge in his lumbar spine;[14] (2) these conditions were not symptomatic prior to the 2012 MVA; and (3) imaging of Mr. Lo's cervical and lumbar spines shows no acute injury, such as a fracture, following the 2012 MVA.[15]

221.    The Parties disagree, however, as to whether Mr. Lo's degenerative conditions were "lit up" by the 2012 MVA.

222.    Dr. Wright testified that spinal degenerative changes are not ordinarily painful but that an injury to the spine could cause a permanent pinching of the nerves, which in turn leads to painful symptoms such as the ones Mr. Lo experienced following the 2012 MVA.

223.    But, as Drs. Bays and Dagher credibly explained, such an exacerbation of pre-existing conditions would ordinarily be accompanied by some evidence of acute trauma or other change to the spine, which did not occur with the 2012 MVA. Specifically, while spinal stenosis *can* occur in the process of healing from a bone fracture or dislocation rather than from degeneration, nothing indicates that Mr. Lo suffered such a fracture or dislocation from the 2012 MVA. Indeed, as Dr. Wright acknowledged at trial, none of Mr. Lo's treatment providers found that his degenerative spine conditions were aggravated by the 2012 MVA.

224.    Mr. Lo's lower back pain and right leg pain were caused by the central canal stenosis in his lumbar spine, which was present well before the 2012 MVA. Notably, much of

---

[14] It is not clear whether these two conditions are degenerative. For example, Dr. Bays opined that Mr. Lo's central canal stenosis was congenital, meaning Mr. Lo was born with the condition. The Parties appear to have used the term "degenerative changes" as a catchall for Mr. Lo's pre-existing spinal conditions. *See, e.g.*, Dkt. No. 158 at 30 (Government's closing argument describing stenosis as degenerative). The Court adopts the same convention. In any case, the distinction is not material in the Court's findings and conclusions in this case.

[15] To the extent that the medical experts differed in their opinions of Mr. Lo's lumbar and cervical spine conditions, the Court generally places greater weight on the opinions of Drs. Dagher and Bays, who personally reviewed Mr. Lo's medical records—including his various imaging studies—whereas Dr. Wright primarily relied on the review and summaries of a records specialist in incorporating Mr. Lo's records into his opinions.

Mr. Lo's lower back pain and virtually all of his right leg pain were resolved by his August 2016 lumbar laminectomy, which only treated his stenosis and the related compression of his nerve root at L4.[16] Mr. Lo reported significant relief in his lower back and right leg pain within weeks following the surgery.

225.    In particular, Mr. Lo failed to show what—if any—portion of his lower back and right leg pain after the November 2014 "spike" is attributable to the 2012 MVA. As Dr. Dagher credibly testified, the two-year delay between the 2012 MVA and the November 2014 "spike" in Mr. Lo's lower back and right leg pain is, physiologically, nearly impossible. Drs. Dagher and Bays also credibly opined that the two-year delay disproves that Mr. Lo's lower back and right leg pain were caused by the 2012 MVA.[17] Because the August 2016 lumbar laminectomy followed and treated the November 2014 "spike," Mr. Lo cannot recover for any damages arising out of the surgery.

226.    As for the neck pain, the Court notes that Mr. Lo complained of pain in his neck following the 2006 MVA, but Dr. Wright did not know any details about the MVA and did not review Mr. Lo's 2006 cervical spine X-ray. This further erodes the credibility of Dr. Wright's opinion regarding Mr. Lo's neck pain and its relationship to the 2012 MVA.

227.    Accordingly, Mr. Lo has failed to show, by a preponderance of the evidence, that he is entitled to recover damages for his neck pain, lower back pain, and right leg pain (beyond whiplash-related injuries), as well as his August 2016 lumbar laminectomy.

---

[16] While the Government focuses on the *left*-sided disk bulge in Mr. Lo's lumbar spine at L3-4 and its inconsistency with Mr. Lo's *right* leg pain, Dr. Chen, Mr. Lo's lumbar surgeon, found (as Dr. Bays acknowledged) that Mr. Lo's lumbar stenosis was compressing the L4 nerve root on the right side, which is consistent with the right leg pain.

[17] Dr. Wright suggested that the November 2014 "spike" would not have been so unusual or unexpected had it been preceded by other similar flare-ups. Mr. Lo did not show, however, that any such flare-ups occurred.

### c.   *Hip Pain*

228.    Mr. Lo failed to show that he suffered any significant hip pain as a result of the 2012 MVA. While Mr. Lo testified that he suffered hip pain following the 2012 MVA, he failed to introduce any significant amount of evidence regarding the cause and general nature of such hip pain.[18] For example, the evidence was unclear as to the timing, duration, frequency, and intensity of the pain. Dr. Dagher did testify, however, that Mr. Lo's hip pain was largely resolved by a July 2020 surgery that treated a congenital deformity, indicating that Mr. Lo's hip pain was not caused by an injury such as the 2012 MVA. Mr. Lo also introduced no evidence explaining how the 2012 MVA could have "lit up" a congenital condition and caused the hip pain.

229.    Accordingly, Mr. Lo has failed to show, by a preponderance of the evidence, that he is entitled to recover damages for his hip pain.

### d.   *Right Upper Extremities Pain*

230.    The Court finds that Mr. Lo suffered pain, numbness, and tingling in his right upper extremities that were proximately caused by the 2012 MVA.

231.    As Drs. Dagher and Bays acknowledged at trial, Mr. Lo complained of right-sided pain on the day of the 2012 MVA and reported pain, numbness, and tingling in his right arm just three days after the accident.

232.    The Parties' expert opinions differ on the precise nature of the right-sided upper body pain, with Dr. Wright opining that the 2012 MVA caused a stretching of the brachial plexus and Dr. Bays opining that Mr. Lo suffered a contusion or strain to the right shoulder. Dr. Wright also separately connected Mr. Lo's right upper extremities pain with an injury to his cervical spine by opining that Mr. Lo suffered from cervical radiculopathy (discussed below).

---

[18] Dr. Wright's opinions regarding the hip injury were excluded in a prior order of the Court. Dkt. No. 91 at 9.

233.    No medical expert offered an actual credible diagnosis for Mr. Lo's right upper extremities pain.

234.    Dr. Wright opined that the 2012 MVA caused brachial plexopathy and cervical radiculopathy on the right side in relation to Mr. Lo's right upper extremities pain. Dr. Dagher disputed this diagnosis, credibly testifying that Mr. Lo's physical exams and imaging did not show any objective findings to support either condition. And, as Dr. Wright admitted at trial, none of Mr. Lo's treating providers diagnosed Mr. Lo with either condition. While Dr. Fosmire preliminary diagnosed Mr. Lo with brachial plexopathy, this diagnosis occurred *before* Dr. Fosmire performed a nerve conduction study, MRI, and EMG on Mr. Lo. The test results were mixed, and the Parties' experts dispute the meaning of these test results. Ultimately, Dr. Fosmire did not diagnose Mr. Lo with brachial plexopathy (or cervical radiculopathy) and eventually discharged Mr. Lo from his care.[19] The Government's experts offered no serious alternative explanation for Mr. Lo's right upper extremities pain.

235.    Nonetheless, Mr. Lo continues to suffer from pain in his right upper extremities, though he has experienced significant relief from cervical radiofrequency ablations, which target specific branches of nerves that extend out to his right arm.

236.    Accordingly, the Court finds that Mr. Lo has suffered pain (including numbness and tingling) in his right upper extremities as a proximate cause of the 2012 MVA. The lack of a medically identified diagnosis for Mr. Lo's right upper extremities pain does not bar this finding. *See, e.g.*, *Carson v. United States*, No. C18-5858, 2021 WL 3124516, at *5 (W.D. Wash. July 23, 2021) (noting lack of diagnosis in findings of plaintiff's personality issues that were

---

[19] The records also show that Drs. Fosmire and Baker considered a diagnosis of CRPS for Mr. Lo during treatment. However, the Parties introduced no medical expert testimony on CRPS at trial. *See generally* Dkt. No. 91 at 9 (order striking Dr. Wright's opinions regarding CRPS). In any case, Drs. Fosmire and Baker also ruled out a diagnosis of CRPS after the lack of success from stellate ganglion blocks.

1    exacerbated by USPS truck collision); *Fahndrich v. Williams*, 194 P.3d 1005, 1009 (Wash. Ct.

2    App. 2008) (holding that plaintiff was entitled to noneconomic damages where medical experts

3    disagreed about the diagnosis but agreed she suffered from neck pain and headaches); *see also*

4    *McLaughlin*, 774 P.2d at 1175 ("It is not always necessary to prove every element of causation

5    by medical testimony. If, from the facts and circumstances and the medical testimony given, a

6    reasonable person can infer that the causal connection exists, the evidence is sufficient.").

7                **2.**     **Mental and Emotional Injuries**

8            237.    Mr. Lo also suffered serious negative effects on his mental health and general

9    emotional anguish as a proximate result of the 2012 MVA, including the development of PTSD

10   and MDD as well as related symptoms such as anxiety, depression, suicidal ideation, acts of self-

11   harm, paranoia, insomnia, panic attacks, and sexual dysfunction.

12           238.    The Parties' psychological experts agree that Mr. Lo suffers from both PTSD and

13   MDD.[20] Dr. Brown opined that the disorders were caused by the 2012 MVA, while Dr. Bates

14   opined that the disorders were caused by the *pain* that Mr. Lo felt and not necessarily the 2012

15   MVA.

16           239.    The Court finds Dr. Brown's opinions, including that Mr. Lo's disorders were

17   caused by the 2012 MVA, more compelling and finds that Dr. Bates's opinions suffer from

18   certain credibility concerns.

19           240.    For example, Dr. Bates's administration of the MMPI was flawed, as he failed to

20   properly control for the known unreliability of the MMPI for Asian Americans. Dr. Bates largely

21   relied on a study concluding that Asian Americans without linguistic difficulty in taking the

22   MMPI did not show significant accuracy issues. But this study was not applicable to Mr. Lo,

23

24   _____
     [20] Dr. Bates also opined that Mr. Lo suffers from SSD, which Dr. Brown disagreed with. The Court will not make a
     finding as to whether Mr. Lo suffers from SSD. In any event, SSD was not a theory put forth by Plaintiff.

1   who demonstrated barriers to his English language comprehension throughout the trial and

2   during the MMPI, with Dr. Bates himself finding it necessary to deviate from the standard

3   administration of the MMPI to assist Mr. Lo with the test. Dr. Bates's findings of Mr. Lo's

4   purported over- and under-reporting of his symptoms were based in part on the flawed

5   administration of the MMPI.

6        241.    It is also clear that the 2012 MVA is a significant trigger for and the primary

7   cause of Mr. Lo's mental health symptoms and general emotional anguish. He experiences panic

8   attacks and distress at the sight of flashing lights from an ambulance, for example, and he

9   struggled to return to driving, a former favorite past-time, for several years following the 2012

10  MVA. He also interpreted his therapists as wanting him to accept that the 2012 MVA had

11  permanently changed his life, which caused him much distress. This conclusion is further

12  supported by Dr. Brown's administration of the CAPS-5, which required Mr. Lo to focus on the

13  2012 MVA and informed Dr. Brown's PTSD diagnosis, a diagnosis that Dr. Bates and Mr. Lo's

14  treatment providers agreed with.

15  **D.    Damages**

16       242.    Mr. Lo seeks to recover noneconomic damages, economic damages for lost

17  wages, lost earning capacity, and/or cost of retraining, and economic damages for future medical

18  care. The Court awards the following damages.

19       **1.    Noneconomic Damages**

20       243.    Noneconomic damages mean a plaintiff's "subjective, nonmonetary losses,

21  including, but not limited to pain, suffering, inconvenience, mental anguish, disability or

22  disfigurement incurred by the injured party, emotional distress, loss of society and

23  companionship, loss of consortium, injury to reputation and humiliation, and destruction of the

24  parent-child relationship." RCW 4.56.250(1)(b).

244.     In awarding noneconomic damages, the Court may not be swayed by passion or prejudice and must "maintain some degree of uniformity in cases involving similar losses," while also minding that "[e]ach case stands on its own facts." *Shaw v. United States*, 741 F.2d 1202, 1209 (9th Cir. 1984). The Court has reviewed the noneconomic damages awarded in other similar matters in Washington and in this District, including those cited by the Parties.

245.     Noneconomic damages do not need to be proven with mathematical certainty and need only be supported by competent evidence. *See, e.g.*, *Pendergrast v. Matichuk*, 355 P.3d 1210, 1217 (Wash. Ct. App. 2015) (affirming noneconomic damages award despite lack of supporting testimony from healthcare professionals or lay witnesses other than plaintiff of her anxiety and distress), *aff'd*, 379 P.3d 96 (Wash. 2016) (en banc). Noneconomic damages need not be reduced to present cash value. WPI 34.02.

246.     Having considered the evidence, the Parties' arguments, and awards in other cases, the Court concludes that Mr. Lo is entitled to an award of noneconomic damages in the amount of $200,000 for the pain and suffering caused by the Government's negligence in the 2012 MVA as detailed above. This amount is sufficient to compensate Mr. Lo for the pain and suffering connected to the day of the collision, his recovery period, and the remainder of his life. This includes the physical pain Mr. Lo has suffered, the burdens and limitations placed on Mr. Lo's personal life and relationships, and the mental health issues and emotional anguish Mr. Lo has suffered as a proximate result of the 2012 MVA.

247.     The Court awards Mr. Lo **$200,000** for noneconomic damages.

**2.     Economic Damages**

248.     Economic damages are "objectively verifiable monetary losses, including medical expenses, loss of earnings, . . . cost of obtaining substitute domestic services, loss of employment, and loss of business or employment opportunities." RCW 4.56.250(1)(a).

249.     Pursuant to a prior order of the Court, Mr. Lo is precluded from recovering past medical expenses. Dkt. No. 92.

### a.     Lost Wages, Lost Earning Capacity & Cost of Retraining

250.     A plaintiff may recover lost wages or lost earning capacity for the period of time he was disabled due to the injury, whether temporary or permanent. *See Kubista v. Romaine*, 538 P.2d 812, 815 (Wash. Ct. App. 1975) (explaining that lost wages is for temporary disability and lost earning capacity is for permanent disability), *aff'd*, 549 P.2d 491 (Wash. 1976) (en banc); *see also Mendelsohn v. Anderson*, 614 P.2d 693, 698 (Wash Ct. App. 1980) (Dore, J., concurring in part, dissenting in part) (explaining that, generally, lost wages is for the past and lost earning capacity is for after the trial). A plaintiff may also instead recover the cost of retraining required to recover any lost earning capacity. *See Kubista*, 538 P.2d at 815.

251.     Any award for future economic damages, such as lost earning capacity, must be reduced to present cash value. WPI 34.02.

252.     The Court finds that Mr. Lo suffered a temporary disability for approximately three months as a result of the 2012 MVA due to his whiplash-related injuries and is entitled to lost wages for that period of time.

253.     Mr. Lo failed to show, by a preponderance of the evidence, that he suffered any other period of disability and related lost wages or lost earning capacity as a result of the 2012 MVA.[21] Notably, Mr. Lo's earnings following the 2012 MVA did not differ significantly from the years immediately prior to the accident; he even earned more in 2015, 2017, 2018, and 2019

---

[21] While the Court finds that Mr. Lo continues to suffer from right upper extremities pain as a result of the 2012 MVA, Mr. Lo failed to show how much, if any, this specific pain (separate from the other injuries he complains of) imposes a functional limitation such that his earning capacity has been impaired by it. As for Mr. Lo's continued psychological symptoms, Dr. Brown did not opine on any psychological limitations to Mr. Lo's employability for any period of time.

than he had in 2011 or 2012. Mr. Lo also attested to his ability to work when he filed for unemployment benefits starting in 2020.

254.    Further, Mr. Lo cannot recover for the cost of retraining, because he has already demonstrated his ability to work in a semi-clerical position (particularly given his prior real estate and insurance licenses and his ability to work for Ms. Tso as an office manager) without retraining. He also has not demonstrated any loss in his earning capacity from the 2012 MVA.

255.    The determination of how much lost wages Mr. Lo is entitled to recover for the three months of disability is not straightforward. Ms. Johnson opined that, prior to the 2012 MVA, Mr. Lo had the lost earning capacity of a general construction worker, at approximately $50,838 a year. Mr. Berg disputed this opinion, opining that Mr. Lo's earning capacity has been consistently that of a minimum-wage worker, at approximately $28,000 a year. Both experts also acknowledged that Mr. Lo's pre-2012 employment history show that he was entrepreneurial and did not reflect a steady income. At the time of the 2012 MVA, Mr. Lo had also taken time off to stay home and take care of his children. Mr. Lo earned approximately $2,000 in 2011, 2012, and 2013 each.

256.    Based on these factors and other evidence presented by the Parties, the Court finds that Mr. Lo suffered $600 of lost wages as a proximate result of the 2012 MVA. While Mr. Lo may have had the *capacity* to work full-time prior to the 2012 MVA, Mr. Lo did not in fact do so in the years leading up to the accident. And there is scant evidence to show that he would have returned to full-time work but for the 2012 MVA. The "couple hundred" dollars Mr. Lo earned from various side projects leading up to the 2012 MVA, however, show that he would have continued to earn a similar income for approximately three months while he suffered from whiplash-related symptoms following the 2012 MVA.

257.    As the Government notes in its trial brief (Dkt. No. 136 at 11 n.3), federal law requires that federal and state taxes be deducted from an award for lost compensation under the FTCA. *Shaw v. United States*, 741 F.2d 1202, 1206 (9th Cir. 1984) ("A failure to do so will result in the imposition of punitive damages against the government . . . .").

258.    Neither Party presented any argument at trial regarding the income tax rate that must be deducted for any damages award of lost earnings. Nonetheless, upon the Court's own review of the record, the Court deducts 13.3% from the award. *See id.* at 1207 (noting that trial courts may not "simply ignore these calculations as speculative").

259.    As an initial matter, Washington state does not have a personal income tax. Dep't of Revenue Wash. State, Income tax (last visited Feb. 8, 2023), https://dor.wa.gov/taxes-rates/income-tax.

260.    Mr. Lo does not appear to have paid any federal income taxes in 2011 and 2012. Mr. Lo's tax records appear to show that he had a taxable income of $0 for both years (*see* D-167 at 11, 13), suggesting he paid no federal income tax.[22] The Government has not presented any evidence to the contrary, nor that an award of $600 spread out over the two years would have resulted in federal income tax deductions for Mr. Lo.

261.    However, a deduction for Mr. Lo's self-employment tax liability is appropriate. Mr. Lo was consistently self-employed in the years leading up to the 2012 MVA, and the Court has found that his lost wages from the 2012 MVA are from "side projects" in construction that he likely would otherwise have completed, similar to his earnings from 2011 and the remainder of 2012. The Court takes judicial notice of the 13.3% federal self-employment tax rate (for self-

---

[22] Mr. Lo's tax returns for 2011 and 2012, which might have shown the income tax paid in these years, were not submitted as part of the trial exhibits; instead, Exhibit D-167 contains Mr. Lo's "Account Transcripts" from the IRS showing certain high-level information, including the taxable income, about each tax year.

1  employment earnings at or below $106,800 in 2011 and $110,100 in 2012) in 2011 and 2012,

2  which is also consistent with the rate that Mr. Lo paid in 2011 and 2012 according to his tax

3  records. *See* IRS, Schedule SE (Form 1040) 2012, https://www.irs.gov/pub/irs-prior/f1040sse--

4  2012.pdf; IRS, Schedule SE (Form 1040) 2011, https://www.irs.gov/pub/irs-prior/f1040sse--

5  2011.pdf. Therefore, the Court deducts 13.3% from the $600 award.[23]

6      262.    Accordingly, the Court awards Mr. Lo **$520.20** for lost wages.

7              **b.**    ***Future Medical Care (Life Care Plan)***

8      263.    To recover for future medical expenses, a plaintiff must establish the reasonable

9  value of necessary medical care, treatment, and services required in the future with reasonable

10  probability. WPI 30.07.02.

11      264.    An award for future medical expenses must be reduced to present cash value. *See*

12  WPI 34.02. The Parties have stipulated to the present cash value of each item in Ms. Johnson's

13  life care plan. *See* D-175.

14      265.    The Court finds that Mr. Lo has shown, by a preponderance of the evidence, that

15  he is entitled to recover the cost of cervical radiofrequency ablations at a frequency of

16  approximately every six months for the next two years. The only physical pain caused by the

17  2012 MVA that he continues to suffer from is his right upper extremities pain, which the

18  Government concedes has been effectively treated by cervical radiofrequency ablations in the

19  past. *See* Dkt. No. 158 at 42 ("You know, we can see maybe continuing his ablations, as that's

20  provided some relief to him. . . . [W]e'd present . . . seeing him every six months, getting his

21  ablations for the next two years or so . . . .").

22

23  [23] To the extent that the Court's calculations are not correct, any miscalculations are *de minimis* given the size of the award involved. *See Johnson v. United States*, No. C20-5581, 2022 WL 602172, at *4 (W.D. Wash. Mar. 1, 2022)

24  (holding that no tax liability deduction was necessary for $9,605 lost wages award in the absence of evidence, given *Shaw*'s concerns about large awards in particular).

266.     Mr. Lo has not shown that he is entitled to any other future medical care.

267.     The Court places little to no weight on the remainder of the life care plan.

268.     First, Ms. Johnson heavily relied on Dr. Wright to develop her life care plan. Dr. Wright's testimony, however, was inconsistent with the life care plan. For example, he testified that Mr. Lo will require: pain management and evaluation "every few months" for "eight to nine years, maybe double that" (as opposed to every one to two months for the remainder of Mr. Lo's life, as reflected in the life care plan); six epidural steroid injections in the next eight or nine years (as opposed to every four months for a minimum of one to two years); and a stellate ganglion block once a year for eight or nine years (as opposed to every four months for the remainder of Mr. Lo's life).

269.     Second, even accepting that Ms. Johnson's life care plan reflects Dr. Wright's ultimate opinions, Ms. Johnson's life care plan is inconsistent with Mr. Lo's prior treatment and needs. For example, the life care plan calls for stellate ganglion blocks and cervical epidural steroid injections for every four months (on average) for at least one to two years. D-175. But Mr. Lo's last stellate ganglion block occurred in March 2016, almost seven years ago, after which Drs. Fosmire and Baker determined that there was no need for further stellate ganglion blocks. Similarly, the last cervical epidural steroid injection that Mr. Lo received appears to have been at least four years ago, with no serious indication that further injections are called for.

270.     Finally, Ms. Johnson failed to cite to or rely on sufficient evidence for her estimation of costs for outsourcing Mr. Lo's household services and yardwork, much less that such costs are the result of injuries proximately caused by the 2012 MVA.

271.     Mr. Lo has failed to show that any future care is required to treat his mental health. *See* Dkt. No. 129 at 25 (excluding mental health portions of life care plan).

272.     Accordingly, the Court awards Mr. Lo **$3,776.00** for future medical expenses.

273.     To be clear, the Court does not find that Mr. Lo is fully functional at this time and that he has no physical or mental limitations that require future treatment. The Court merely finds that, based on the injuries that Mr. Lo has *proven* were more likely than not caused by the 2012 MVA (and not an alternate or unknown cause), Mr. Lo is entitled to these specific damages.[24]

### 3.     Mitigation of Damages

274.     The Government argues that Mr. Lo failed to mitigate his damages because he did not regularly attend psychological counseling.

275.     The Court must reduce Mr. Lo's damages to the extent that he failed to mitigate his damages. *Jaeger v. Cleaver Const., Inc.*, 201 P.3d 1028, 1037 (Wash. Ct. App. 2009); *Cox v. Keg Rests. U.S., Inc.*, 935 P.2d 1377, 1380 (Wash. Ct. App. 1997); *see also* RCW 4.22.005, 4.22.015 (proportional decrease for failure to mitigate). A plaintiff fails to mitigate his damages if "there were alternative treatment options available to the plaintiff," and "the plaintiff acted unreasonably in deciding on treatment." *Fox v. Evans*, 111 P.3d 267, 269 (Wash. Ct. App. 2005). It is not unreasonable for a plaintiff to refuse treatment that offers only a possibility of relief. *See, e.g.*, *Leeper v. City of Tacoma*, No. C20-5467, 2021 WL 5182157, at *9 (W.D. Wash. June 10, 2021) (rejecting argument that plaintiff failed to mitigate her PTSD where she did not attend half of her therapy sessions or seek reduced-cost therapy), *report and recommendation adopted*, 2021 WL 4452845 (Sept. 28, 2021), *on appeal*.

276.     The Government bears the burden of proof on this issue. *See, e.g.*, *Cox*, 935 P.2d at 1380; *Bernsen v. Big Bend Elec. Co-op., Inc.*, 842 P.2d 1047, 1052 (Wash. Ct. App. 1993). The Government has not met that burden.

---

[24] The Court is also limited by prior orders excluding evidence. *See, e.g.*, Dkt. Nos. 91, 92, 129.

277.   First, the Government failed to show that the mental health counseling Mr. Lo refused would have been effective but for his failure to attend regularly. *See, e.g.*, *Palla v. L M Sports, Inc.*, No. C16-2865, 2019 WL 6464621, at *9–10 (E.D. Cal. Dec. 2, 2019) ("Although . . . the Court might like to see [Plaintiff] spend more time trying different modalities for physical and emotional relief, . . . Defendant must also show that by engaging in these specific efforts, [Plaintiff] would have, more likely than not, alleviated her injuries in some respect. This, [Defendant] did not do." (citation omitted)). While the Government has shown that, as a statistical matter, therapy is *often* effective in treating PTSD and other psychological conditions that Mr. Lo suffered from, the Government has not met its burden of showing that such services would have been effective for Mr. Lo. Rather than showing improvement from the therapy, Mr. Lo suffered an exacerbation of his mental health symptoms from the therapy he attended.

278.   The mental health counseling that Mr. Lo refused was also not effective because it was not culturally competent, as Dr. Brown compellingly testified. Contrary to Dr. Bates's belief that cultural competency was never raised during Mr. Lo's mental health treatment, Mr. Lo's testimony highlighted the negative stigmas and lack of knowledge in his native Hong Kong culture surrounding mental health issues, and the same was echoed in his records. Relatedly, there were linguistic barriers to Mr. Lo's therapy—which appears to have been only offered in English—given that at least one counselor noted difficulty in understanding Mr. Lo's accented English and Dr. Bates himself felt compelled to modify the administration of the MMPI on Mr. Lo due to linguistic difficulties. The Government failed to prove that Mr. Lo was offered counseling services that would have addressed these significant barriers to Mr. Lo's treatment.

279.   Second, the Court finds that Mr. Lo did not act unreasonably in failing to regularly attend therapy sessions. Mr. Lo attended a number of therapy sessions following the 2012 MVA and made multiple efforts to try therapy despite his aversion to it, including by

actively seeking a mental health referral on at least one occasion and seeing several different counselors. Notably, Mr. Lo attended a number of counseling sessions at two different institutions and with at least three different counselors over the course of several years. Mr. Lo therefore made a good faith effort, under the circumstances, to attend therapy sessions.

280.     The Government points to no authority suggesting that a plaintiff must force himself to treatment he cannot tolerate, and the Court declines to conclude as much here. *See, e.g.*, *Pollard v. E.I. DuPont de Nemours, Inc.*, 338 F. Supp. 2d 865, 879 (W.D. Tenn. 2003) ("It would also be unreasonable to require Plaintiff to undergo painful therapy that causes her further discomfort, stress, anxiety, and depression with little chance of recovery."), *aff'd*, 412 F.3d 657 (6th Cir. 2005). And, as Dr. Brown opined, Mr. Lo did not cause injury to himself by failing to attend consistent therapy sessions.

281.     The Government has not shown, by a preponderance of the evidence, that Mr. Lo failed to mitigate his damages.

282.     Accordingly, Mr. Lo's damages are proportionately reduced by **$0.00**.

**4.     Total Award & Judgment**

283.     For the reasons explained above, the Court finds that Mr. Lo has proven his claim of negligence by a preponderance of the evidence and that the Government failed to prove, by a preponderance of the evidence, Mr. Lo's failure to mitigate damages.

284.     Accordingly, the Court AWARDS Mr. Lo total overall damages of **$204,296.20**, reflecting the following:

- Past and future noneconomic damages: **$200,000.00**

- Lost wages/lost earning capacity/cost of retraining: **$520.20** (lost wages only)

- Future medical care: **$3,776.00**

- Damages arising out of 2014 lumbar laminectomy: **$0.00**

285.    No reduction of the damages is required as a result of Mr. Lo's failure to mitigate.

286.    No reduction of the damages is required to meet the $300,000 cap set by Mr. Lo's original FTCA claim or the additional $1.7 million cap set by Mr. Lo's amended FTCA claim in connection with his lumbar laminectomy.

287.    The Court AWARDS Mr. Lo judgment against the Government, which shall be entered separately.

Dated this 15th day of February 2023.

Tana Lin
United States District Judge